400 F.2d 1002
 RADIO TELEVISION NEWS DIRECTORS ASSOCIATION et al., Petitioners,
v.
UNITED STATES of America and Federal Communications
Commission, Respondents.
COLUMBIA BROADCASTING SYSTEM, INC., Petitioner,
v.
UNITED STATES of America and Federal Communications
Commission, Respondents.
NATIONAL BROADCASTING COMPANY, Inc., Petitioner,
v.
UNITED STATES of America and Federal Communications
Commission, Respondents.
 Nos. 16369, 16498-16499.
 United States Court of Appeals Seventh Circuit.
 Sept. 10, 1968, Certiorari Denied Jan. 13, 1969, See 89
S.Ct. 631.
 
 Lloyd N. Cutler, J. Roger Wollenberg, Timothy B. Dyk, Washington, D.C., Raymond L. Falls, Jr., Lawrence J. McKay, Herbert Wechsler, New York City, Archibaled Cox, Cambridge, Mass., Maurice Rosenfield, Harry Kalven, Jr., Chicago, Ill., W. Theodore Pierson, Vernon C. Kohlhaas, Robert N. Lichtman, Pierson, Ball & Dowd, Harold David Cohen, Washington, D.C., Newton N. Minow, Chicago, Ill., Royal E. Blakeman, New York City, for petitioners.
 Thomas E. Ervin, Howard Monderer, Douglas E. Cutler, New York City (Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, of counsel), for petitioner, National Broadcasting Company, Inc.
 Howard E. Shapiro, Dept. of Justice, Washington, D.C., Daniel R. Ohlbaum, Deputy Gen. Counsel, Robert D. Hadl, Henry Geller, John H. Conlin, Leonore G. Ehrig, Federal Communications Commission, Washington, D.C., Donald F. Turner, Asst. Atty. Gen., Gregory B. Hovendon, Arthur I. Cantor, Attys., Dept. of Justice, Washington, D.C., for respondent.
 Michael H. Bader, William J. Potts, Jr., Washington, D.C., Edwin Lukas, Orrin G. Judd, Earle K. Moore, Ed A. Bernstein, New York City, Ernest F. Staub, Chicago, Ill., for amicus curiae Office of Communication of the United Church of Christ, United Church Board for Homeland Ministries, Board of National Missions of the United Presbyterian Church in the U.S.A., National Division of the Methodist Board of Missions, General Board of Christian Social Concerns of the Methodist Church, The American Jewish Committee, and National Catholic Conference for Interracial Justice, amici curiae, William B. Ball, Harrisburg, Pa., of counsel.
 Lois P. Siegel, Kenneth W. Gross, Washington, D.C., for amicus curiae, King Broadcasting Company; Haley, Bader & Potts, Washington, D.C., of counsel.
 Marshall, Bratter, Greene, Allison & Tucker, New York City, for National Academy of Television Arts and Sciences, amicus curiae; Royal E. Blakeman, New York City, of counsel.
 Before CASTLE, Chief Judge, KILEY and SWYGERT, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 This review raises the question of the constitutionality of the Federal Communications Commission's recently promulgated rules concerning the airing of personal attacks and political editorials by broadcasters licensed by the Commission. An unincorporated association of radio and television journalists and eight companies holding licenses for radio and television stations[1] petitioned this court to review and set aside the final order of the Commission,[2] issued on July 10, 1967, (adopted on July 5, 1967) which set forth the new rules.[3] The Columbia Broadcasting System, Inc., (CBS) and the National Broadcasting Co., Inc. (NBC) filed separate petitions to review the Commission's order in the Court of Appeals for the Second Circuit. These petitions were transferred to this court (28 U.S.C. 2112), and pursuant to our order, the three petitions were consolidated.[4]
 
 
 2
 On April 8, 1966, the Commission released a Notice of Proposed Rule Making. The announced purposes of the rules proposed by the Commission were 'to codify the procedures which licensees are required to follow in personal attack situations' and 'to implement the Times-Mirror[5] ruling as to station editorials endorsing or opposing political candidates.' In its notice, the Commission invited interested parties to file comments on the proposed rules. Of the twenty-six comments filed with the Commission, eighteen opposed and eight favored the adoption of the proposed rules.
 
 
 3
 In the rules dealing with the responsibilities and obligations of licensees with respect to personal attacks, a 'personal attack' was defined as an attack upon the 'honesty, character, integrity or like personal qualities of an identified person or group.' A personal attack would come within the ambit of the rules, however, only if made 'during the presentation of views on a controversial issue of public importance.'
 
 
 4
 According to the Commission's Memorandum Opinion and Order, the personal attack rules were 'simply a particular aspect of the Fairness Doctrine,' and did 'not alter or add to the substance of the Doctrine.' The Fairness Doctrine was initially articulated in the Report of the Commission in the Matter of Editorialization by Broadcast Licensees, 13 F.C.C. 1246 (1949). In that report, the Commission stated the basic obligation of licensees to present broadcasts concerning public issues, in a manner which would insure that the listening public would be exposed to a broad spectrum of views on a given issue.[6] The Commission indicated that 'specific Congressional approval' of the Fairness Doctrine was contained in the 1959 Amendments to section 315 of the Communications Act.[7]
 
 
 5
 When a personal attack has been broadcast by a licensee, the rules require that the licensee, within a reasonable time, but not later than one week after the attack, notify the person or group attacked of the 'date, time and identification of the broadcast,' provide 'a script or tape (or an accurate summary if a script or tape is not available),' and offer to the person or group attacked 'a reasonable opportunity to respond over the licensee's facilities.'Because 'the procedures specified (in prior Commission rulings)[8] have not always been followed (by licensees), even when flagrant personal attacks have occurred in the context of a program dealing with a controversial issue,' the Commission perceived the need for the specific rules here at issue. The Commission's avowed purpose in embodying the procedural aspects of the 'long-adhered to' personal attack principle in rules was twofold: first, to 'clarify and make more precise the obligations of broadcast licensees where they have aired personal attacks'; and second, to enable the Commission 'to impose appropriate forfeitures * * * in cases of clear violations by licensees which would not warrant designating their application for hearing at renewal time or instituting revocation proceedings but * * * do warrant more than a mere letter of reprimand.'
 
 
 6
 Although the promulgation of the rules represented an attempt to 'clarify' a licensee's obligations, the Commission said the 'rules are not designed to answer such questions' as whether a 'personal attack' had occurred or whether the person or group attacked was 'identified.' In spite of the fact that unanswered questions were to be left to the licensee's 'good faith judgment,' if the licensee remained doubtful of his obligations, the Commission invited prompt consultation to obtain interpretation of its rules.
 
 
 7
 Some of the Comments submitted in opposition to the proposed rules contained expressions of fear that the rules would both discourage controversial issue programming and infringe the first amendment guarantee of a free press. With respect to the alleged discouragement of controversial issue programming, the Commission responded:
 
 
 8
 Statements that the rules will discourage, rather than encourage, controversial programming ignore the fact that the rules do no more than restate existing substantive policy-- a policy designed to encourage controversial programming by insuring that more than one viewpoint on issues of public importance are carried over licensees' facilities.
 
 
 9
 Regarding the constitutional question, which the Commission believed to be 'without merit,' it responded:
 
 
 10
 As to these particular rules, we stress again that they do not proscribe in any way the presentation by a licensee of personal attacks or editorials on political candidates. They simply provide that where he chooses to make such presentations, he must take appropriate notification steps and make an offer for reasonable opportunity for response by those vitally affected and best able to inform the public of the contrasting veiwpoint. That such rules are reasonably related to the public interest is shown by consideration of the converse of the rules-- namely operation by a licensee limited to informing the public of only one side of these issues, i.e., the personal attack or the licensee's editorial.
 
 
 11
 In addition, the Commission referred in this regard to the discussion of the 'constitutionality of the fairness doctrine generally in the Report on Editorialization,' 13 F.C.C. 1246 (1949) and the decision in Red Lion Broadcasting Co., Inc. v. FCC, 127 U.S.App.D.C. 129, 381 F.2d 908, cert. granted, 389 U.S. 968, 88 S.Ct. 470, 19 L.Ed.2d 458 (1967).[9]
 
 
 12
 Specific exemptions from the requirements of the personal attack rules were provided in two instances: attacks on 'foreign groups or foreign public figures,' and personal attacks by qualified candidates on other qualfied candidates.[10] The latter exemption was thought to be appropriate in view of the 'equal opportunities' provision of 47 U.S.C. 315[11] with respect to broadcasts by political candidates.
 
 
 13
 The Commission's purpose in promulgating the political candidate editorial rules was to clarify the 'licensee's obligations in regard to station editorials endorsing or opposing political candidates.' The rules require that a licensee who broadcasts and editorial endorsing or opposing a candidate for public office must offer the other qualified candidates or the candidate opposed 'a reasonable opportunity * * * to respond.'[12] The response can be made through a spokesman of the candidate's choice.[13] A twenty-four hour notification requirement was imposed because 'time is of the essence in this area and there appears to be no reason why the licensee cannot immediately inform a candidate of an editorial.' In those situations where a political editorial is broadcast within seventy-two hours of the day of election, the rules require notification before the broadcast. Although disclaiming any intention to prohibit 'lastminute editorials,' the Commission believed 'such editorials would be patently contrary to the public interest and the personal attack principle' unless the candidate were notified sufficiently far in advance to present a timely response.[14]
 
 
 14
 On August 7, 1967 the Commission[15] issued a Memorandum Opinion and Order (adopted on August 2, 1967), enlarging the specific exemptions from the requirements of the previously-adopted personal attack rules.[16] Under the amendment,[17] the personal attack rules were no longer applicable 'to the bona fide newscast or on-the-spot coverage of a bona fide news event.' The Fairness Doctrine, however, remained applicable to the exempt categories. The Commission considered the amendment necessary because the application of the specific personal attack requirements to these two news categories would be 'impractical and might impede the effective execution of the important news functions of licensees or networks' by replacing news broadcasts with responses to personal attacks. The Commission exempted broadcast of on-the-spot coverage of a bona fide news event, because 'this area is akin to the newscast area,' personal attacks in such programs are 'unlikely to be large in number * * * the notification aspect is relatively less needed in this area,' and application of the Fairness Doctrine in this area was sufficient.
 
 
 15
 'Editorials or similar commentary, embodying personal attacks, broadcast in the course of newscasts,' were specifically referred to in the Commission's memorandum opinion as not being exempt from the personal attack rules. If a licensee chose to present a personal attack in these broadcasts, the Commission believed that the licensee should not make the determination as to what the public would or would not hear in response to the personal attack. In addition, 'time and practical considerations, discussed with respect to the news itself,' were not thought to be germane to 'editorials or similar commentary.' The Commission did not exempt 'news documentaries' from the personal attack rules because they were not thought to 'involve the time and practical considerations' which necessitated the other exemptions and because 'a documentary, even though fairly presented, may necessarily embody a point of view.' 'News interview shows' were not exempted because of the absence of 'time and practical considerations' and because a licensee having 'chosen to provide one person with an 'electronic platform' for an attack' was required, by 'elemental fairness and the duty to inform the public,' to allow the person attacked to respond.
 
 
 16
 While the instant petitions were pending in this court, the Commission filed a motion requesting authority to once again revise the personal attack rules.[18] We granted the Commission's request, and on March 29, 1968, the Commission[19] issued a Memorandum Opinion and Order (adopted on March 27, 1968) containing a revision of the personal attack rules. The revision[20] further enlarged the categories of news-related programs which would be exempt from the personal attack rules. The two added exemptions covered the 'bona fide news interview' and the 'news commentary of analysis contained' in either bona fide newscasts, bona fide news interviews, or on-the-spot coverage of a bona fide news event.
 
 
 17
 In the memorandum opinion accompanying the new revision, the Commission stated that the 'revision * * * (was) of a relatively narrow nature,'[21] and was in response to allegations of the 'inhibiting effects of the rules on the discharge of the journalistic functions of broadcast licenses.' The Commission believed that its revision would avoid 'any possibility of inhibition in these important areas of broadcast journalism' even though 'the showing as to inhibiting effects remains speculative.'
 
 
 18
 Several additional considerations prompted the Commission to make the new revisions. First, noting the exemptions of four categories of news-type programs from the 'equal opportunities' requirement of section 315,[22] the Commission observed that 'the personal attack facet can have some similarities to the 'equal opportunities' requirement in its application in this area.' Second, the Commission had not found, in the exempt news categories, the 'flagrant failures by licensees to follow the requirements of the fairness doctrine' evident in 'editorializing by licensees or syndicated programming.' Third, the Commission desired 'to promote the fullest possible robust debate on public issues.'
 
 
 19
 Although enlarging the scope of the exemptions, the Commission reiterated that the Fairness Doctrine (giving 'the licensee considerable discretion') remained applicable to the exempt categories. In particular, when personal attacks occurred in the course of any of the exempt broadcasts, the Commission stated:
 
 
 20
 Our revision affords the licensee considerable leeway in these news-type programs but it still requires that fairness be met, either by the licensee's action of fairly presenting the contrasting viewpoint on the attack issue or by notifying and allowing the person or group attacked a reasonable opportunity to respond.
 
 
 21
 The 'labelled station or network editorial' and the 'news documentary' were not added to the group of exempt broadcasts. Although the Commission viewed 'news commentary or analysis' to be 'an integral and important part of the news process involved in the category 'bona fide newscast" and viewed 'the bona fide news interview' to be 'a means of developing the news and informing the public which the Congress singled out in the 1959 Amendments (to section 315),'[23] the 'labelled station or network editorial' was viewed as 'akin to * * * the political editorializing area.' With respect to its reasons for not exempting news documentaries, the Commission could foresee 'no factor of even possible inhibition in the case of a documentary, which is assembled over a period of time.' In addition, the Commission stressed that the documentaries exempted by Congress in section 315 were unique in that, 'the appearance of the candidate is incidental to the presentation of the subject matter of the documentary; his rivals may have no connection with the program at all.'
 
 
 22
 Petitioners' primary contention is that the Commission's personal attack and political editorial rules, as amended, will impose unconstitutional burdens on the freedom of the press protected by the first amendment.[24] The petitioners urge that a variety of such burdens will result from the Commission's enforcement of these rules. (1) A licensee will be unwilling to broadcast personal attacks and political editorials or to allow his facilities to be used as a vehicle for such broadcasts if he is required by the Commission's rules to incur the expense of notifying the person or group attacked, of providing a transcript of the attack, and of donating free time for a reply. This burden will be exacerbated by the potential disruption that the necessity of airing replies will have in displacing previously scheduled programs. (2) A conscientious licensee will be inhibited from speaking out on either controversial issues or impending elections if to do so means that he must provide time for the airing of unorthodox views in reply. (3) The broadcasting of controversial issues of public importance will be inhibited due to the licensee's uncertainty concerning the application of the Commission's rules to a given situation. (4) The licensee's journalistic judgment and spontaneity in programming will be impeded because the Commission's rules require the licensee to determine on a broadcast-by-broadcast basis whether compliance with the rules has been met. (5) An individual licensee affiliated with a network will be reluctant to carry a network program covered by the rules because if a response to a network program broadcast by the affiliate is required, the affiliate must either air the network's response or make independent arrangements to comply with the rules. (6) A licensee will be required to impose rigorous censorship on those who use his facilities since the licensee is individually reponsible for all the material which he broadcasts.
 
 
 23
 Besides the alleged unreasonable burdens imposed upon licensees, the petitioners point to several additional difficulties which they argue inhere in the Commission's rules. They contend that the rules are too vague, given the wide range of severe penalties a licensee faces for failing to comply with them. Petitioners refer to the uncertain meaning of terms in the rules such as 'attack,' 'character,' 'like personal qualities,' and 'identified individual.' Moreover, they argue that the Commission's offer to make itself available promptly to resolve these interpretative questions could place the Commission in the role of a censor. Through the power to interpret vague rules, the Commission would be in a position to determine which views, opposing those expressed over a licensee's facilities, do or do not merit a right of reply. The petitioners claim that this discretionary power is susceptible to the possibility of abuse. In effect, they urge that the rules could result in the Commission substituting its judgment concerning what is to be broadcast for the judgment of individual licensees. The petitioners argue that in order to avoid this prospect, a licensee might attempt to either broadcast every side of every issue or curtail the broadcasting of controversial public issues and political editorials altogether. The result of each alternative would be a bland neutrality in the broadcasting media which petitioners urge is not in the public interest.
 
 
 24
 Neither the Commission's three memorandum opinions nor its brief filed in this court are altogether responsive to the various contentions raised by the petioners. The Commission characterizes the petitioners' arguments as asserting 'a constitutional right to make a onesided presentation.' This non-existent constitutional right, according to the Commission, is predicated on the petitioners' failure to recognize the substantial differences between the various communication media, particularly the differences between newspapers and radio and television. Because of this failure, the Commission believes that the petitioners' arguments lead to the untenable conclusion that the entire licensing scheme of the Communications Act is unconstitutional. Although conceding that the first amendment applies to broadcasting, the Commission urges that 'different rules and standards are appropriate for different media of expression in light of their differing natures.' Finally, the Commission flatly asserts in a perfunctory fashion that under the rules as amended, there is no 'possibility of inhibition' of licensees.
 
 
 25
 We approach the primary question raised in this review-- the constitutionality of the Commission's personal attack and political editorial rules-- against the backdrop of a host of Supreme Court decisions. Those decisions have established the standards by which to assess claims that governmental statutes, regulations or practices abridge freedom of speech in violation of the first amendment. For example, the Supreme Court has said: 'Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely, lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer.' Ashton v. Kentucky, 384 U.S. 195, 200, 86 S.Ct. 1407, 1410, 16 L.Ed.2d 469 (1966). 'Standards of permissible statutory vagueness are strict in the area of free expression. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.' NAACP v. Button, 371 U.S. 415, 432, 433, 83 S.Ct. 328, 337, 338, 9 L.Ed.2d 405 (1963).
 
 
 26
 Turning from cases dealing generally with the first amendment to cases dealing with the freedom of the press in particular, a series of recent Supreme Court decisions, beginning with New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), delineated the Court's views on the proper accommodation of the private interests served by libel actions in vindicating those who are defamed with the public interests served by the printed press in criticizing public officials or public figures and in illuminating public issues.[25] In the New York Times case, a public official, one of the city commissioners of Montgomery, Alabama, brought a libel action against certain individuals and the Times as a result of critical statements appearing in a full page advertisement. After reviewing previous decisions, the Court said, 'None of the cases sustained the use of libel laws to impose sanctions upon expression critical of the official conduct of public officials.' 376 U.S. at 268, 84 S.Ct. at 719. The Court observed the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' 376 U.S. at 270, 84 S.Ct. at 721. Nor was this commitment of recent origin, as, 'The right of free discussion of the stewardship of public officials was * * * in Madison's view, a fundamental principle of the American form of government.' 376 U.S. at 275, 84 S.Ct. at 723. In ruling that actual malice must be the standard of proof in such libel actions, the Court said that under a less stringent standard:
 
 
 27
 The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute. * * * Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which First Amendment freedoms cannot survive. 376 U.S. at 277, 278, 84 S.Ct. at 724, 725.
 
 
 28
 The import of New York Times and its progeny is that the freedom of the press to disseminate views on issues of public importance must be protected from the imposition of unreasonable burdens by governmental action. We address ourselves, therefore, to the question whether the Commission's rules here in issue pose unreasonable burdens on licensees.
 
 
 29
 Despite the Commission's disclaimers to the contrary, we agree with the petitioners that the rules pose a substantial likelihood of inhibiting a broadcast licensee's dissemination of views on political candidates and controversial issues of public importance.[26] This inhibition stems, in part, from the substantial economic and practical burdens which attend the mandatory requirements of notification, the provision of a tape, and the arrangement for a reply.[27]
 
 
 30
 Although most of the rules' specific requirements have been the subject of Commission rulings pursuant to individual complaints under the Fairness Doctrine, there are two crucial differences between the specific rules we are reviewing and that doctrine. A major premise underlying the Fairness Doctrine is the Commission's trust in the good faith and sensible judgment of a broadcast licensee in dealing with personal attacks and political editorials in a fair and reasonable manner.[28] Under the rules here in question, however, much of the licensees' discretion is replaced by mandatory requirements applicable to each broadcast. The other difference between the rules and the Fairness Doctrine is that the only sanction for noncompliance with the Fairness Doctrine is the possibility that a license will not be renewed if the Commission determines that granting a renewal will not serve the 'public interest, convenience, and necessity.' This determination and the accompanying sanction would be based on the licensee's overall performance during the preceding three years. Under the rules here in issue, however, the question whether a licensee would be subjected to the Commission's broad range of enforcement powers[29] could be determined on the basis of a single broadcast by the licensee. As a consequence, whatever discretion is still reposed in a licensee under the new rules with respect to his handling of personal attacks and political editorials must be exercised in the face of the omnipresent threat of suffering severe and immediate penalties.[30]
 
 
 31
 We need not elucidate the proposition that the public interest will not best be served if the Commission's rules operate to discourage a licensee from engaging in the broadcast of controversial issues or political editorials. Moreover, the public interest will not necessarily best be served if a licensee adheres meticulously to the Commission's rules. Strict compliance with the rules might result in a blandness and neutrality pervading all broadcasts arguably within the scope of the rules. Apparently the Commission views programming which takes sides on a given issue to be somehow improper or contrary to the public interest. Thus, in explaining its failure to exempt documentaries from the personal attack rules, the Commission stated in its memorandum opinion of August 7, 1967, 'that a documentary, even though fairly presented, may necessarily embody a point of view.' This statement and the thrust of the rules themselves reflect an apparent desire on the Commission's part to neutralize (or perhaps to eliminate altogether) the expression of points of view on controversial issues and political candidates. Such a result would be patently inconsistent with protecting the invaluable function served by the broadcast press in influencing public opinion and exposing public ills.[31]
 
 
 32
 In addition, the petitioners express fears that a licensee's strict adherence to the requirement that he provide an opportunity to reply might result in the public airing of obnoxious or extreme views. Of course, the Commission might take the position that a licensee need not comply in those situations. But allowing the Commission selectively to enforce the rules so as to prevent the expression of those views it believes to be contrary to the best interests of the American public would cast the Commission in the role of a censor, contrary to the express provisions of the Communications Act.[32]
 
 
 33
 An even greater threat of Commission censorship arises due to the lack of specificity in the rules. The Commission has invited a licensee to seek its advice whenever he is unsure of his obligations under the rules. In fact, the Commission itself has recognized the possibility that such situations will arise.[33] But if the rules are so unclear that a licensee needs to obtain advisory interpretations from the Commission, it follows that the Commission, through interpretation of its own vague rules, has the power to effectively preclude the expression of views, whether by a licensee or a respondent, with which it does not agree.[34]
 
 
 34
 We agree with the petitioners that such terms as 'attack,' 'character,' and 'like personal qualities' are subject to diverse interpretations and applications. Besides the unclear meaning of these essential terms in the rules, the Commission has failed to articulate the meaning of the rules. That the rules have been twice amended since their initial promulgation (once even while the instant reviews were pending in this court)[35] suggests that the Commission's aims in promulgating the rules are uncertain and changing. In its initial memorandum opinion, the Commission illustrated a situation in which the obligations imposed by the personal attack rules would arise, namely, the making of 'a statement in a controversial issue broadcast that a public official or other person is an embezzler or a Communist.'[36] In its memorandum opinion accompanying the most recent revision of the rules, the Commission, in a footnote, redefined when the personal attack rules become applicable. The Commission said, 'The rule is applicable only where a discussion of a controversial issue of public importance contains a personal attack which makes the honesty, integrity or character of an identified person or group an issue in that discussion.' The Commission's first formulation suggests that any personal attack occurring during the course of a controversial issue broadcast is subject to the rules. The Commission's last formulation, however, suggests that only those personal attacks which are themselves an issue in the broadcast are subject to the rules.
 
 
 35
 Another example of the Commission's uncertain position regarding a licensee's obligations under the rules concerns its treatment of personal attacks occurring during the course of editorials or commentary. When the Commission first amended the rules to exempt the 'bona fide newscast' and 'on-the-spot coverage of a bona fide news event,' the Commission said in its accompanying memorandum opinion that the exemption was inapplicable to 'editorials or similar commentary.' The clear implication from the last quoted language is that there is little, if anything, distinguishing 'edtiorials' from 'similar commentary.' Yet in the memorandum opinion accompanying its last amendment to the rules, the Commission made a distinction between the two categories for it exempted 'news commentary or analysis in a bona fide newscast' but left the 'labeled station or network editorial' still subject to the rules.[37]
 
 
 36
 Similar uncertainty is evident in the Commission's treatment of the 'news documentary.' The Commission said in creating the various exemptions from the personal attack rules that it was 'following the line drawn by Congress' when Congress created the exemptions in section 315. Congress exempted the news documentary, 'if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary.' Yet the Commission did not exempt the news documentary from the personal attack rules even though any personal attack which might occur would likewise be incidental to the subject of the documentary.[38] The Commission's explanation for its failure to treat news documentaries as Congress treated them in section 315 was expressed by the Commission in its last memorandum opinion: 'There is no factor of even possible inhibition in the case of a documentary which is assembled over a period of time.' This explanation is debatable in view of the ever increasing pace of significant news developments and the valuable function served by documentaries in illuminating these developments.[39]
 
 
 37
 What these examples demonstrate is that the Commission's rules are too vague because they lack standards precise enough to enable a licensee to ascertain whether he is subject to the rules' obligations. When a licensee considers the vagueness of the rules, the mandatory and pervasive requirements of the rules, and the threat of suffering serious sanctions for noncompliance with them, it is likely that he will become far more hesitant to engage in controversial issue programming or political editorializing. Consequentially, he will 'steer far wider of the unlawful zone.' Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). Given the fast pace of news developments, a licensee will be understandably reluctant to make the difficult on-the-spot judgments demanded by the Commission's rules, the meaning of which are uncertain to both the licensee and the Commission. In Farmers Educational and Cooperative Union of America, North Dakota Division v. WDAY, Inc., 360 U.S. 525, 530, 79 S.Ct. 1302, 1306, 3 L.Ed.2d 1407 (1959), the Supreme Court commented on the practical difficulties facing licensees in an analogous situation concerning the censorship prohibition of section 315:
 
 
 38
 The decision a broadcasting station would have to make in censoring libelous discussion by a candidate is far from easy. Whether a statement is defamatory is rarely clear. Whether such a statement is actionably libelous is an even more complex question * * * Such issues have always troubled courts. Yet, under petitioner's view * * * they would have to be resolved by an individual licensee during the stress of a political campaign, often, necessarily, without adequate consideration or basis for decision. Quite possibly, * * * all remarks even faintly objectionable would be excluded out of an excess of caution.
 
 
 39
 In addition, due to a licensee's uncertainty of his obligations under the rules, it is more likely that he will engage in rigorous self-censorship of the material he broadcasts, than if he were subject only to the Fairness Doctrine.[40] Such self-censorship would restrict the dissemination of views on public issues-- essential to an informed citizenry. In Smith v. People of State of California, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed. 205 (1959), the Supreme Court had occasion to comment on the evils of selfcensorship, saying:
 
 
 40
 The bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it the distribution of all books, both obscene and not obscene, would be impeded.
 
 
 41
 In response to the petitioners' attack on the rules, the Commission has advanced two arguments to support its position that the rules are constitutional. First, the Commission relies on the recent decision in Red Lion Broadcasting Co., Inc. v. FCC, 127 U.S.App.D.C. 129, 381 F.2d 908, cert. granted, 389 U.S. 968, 88 S.Ct. 470, 19 L.Ed.2d 458 (1967). Red Lion concerned the challenge by a radio station licensee of a Commission order requiring the licensee to make free reply-time available to a person who had been personally attacked on a program broadcast over the licensee's station. The Commission's order predated the personal attack rules here in question.
 
 
 42
 In correspondence with the licensee prior to the issuance of the order, the Commission indicated that the procedural requirements (later formalized in the new personal attack rules) should be complied with by the Red Lion radio station. The Commission wrote:
 
 
 43
 The licensee, with the exception of appearances of political candidates, is fully responsible for all matter which is broadcast over his station, including broadcasts containing a personal attack. The latter is defined in our recent fairness primer as an attack '* * * on an individual's or group's honesty, character, integrity, or like personal qualities * * *' in connection with a controversial issue of public importance * * *.
 
 
 44
 Where such an attack occurs, the licensee has an obligation to inform the person attacked of the attack, by sending a tape or transcript of the broadcast, or if these are unavailable, as accurate a summary as possible of the substance of the attack, and to offer him a comparable opportunity to respond.
 
 
 45
 The Commission also indicated in the course of this correspondence that its ruling was an application of the Fairness Doctrine, 'as applied to this situation.'
 
 
 46
 Judge Tamm, who wrote the principal opinion sustaining the Commission's order (Judge Fahy concurred in the result; Judge Miller did not participate in the decision on the merits), devoted the major portion of his discussion to a consideration of the constitutionality of the Fairness Doctrine. He held that Congress did not unconstitutionally delegate its legislative function to the Commission by enacting 47 U.S.C. 315, which 'adopted' the Fairness Doctrine, and he concluded:
 
 
 47
 The Fairness Doctrine is not unconstitutionally vague, indefinite, or uncertain, nor does it lack the precision required in legislation affecting basic freedoms guaranteed by the Bill of Rights. * * * (And that) under the facts in this case, the requirement under the Fairness Doctrine that a broadcaster may not insist upon financial payment by a party responding to a personal attack does not violate the first and fifth amendments to the Constitution nor is the Dictrine violative of either the ninth and tenth amendments. 381 F.2d at 930.
 
 
 48
 We believe two observations are in order with reference to Judge Tamm's opinion and the holding in that case. First, we draw a distinction between the personal attack rules, whether incorporated in an ad hoc ruling such as occurred in Red Lion or in formal rules such as have now been promulgated by the Commission, and the Fairness Doctrine as referred to in section 315.[41] With that distinction in mind, we are not prepared to hold that the Fairness Doctrine is unconstitutional. Moreover, we do not believe that it is necessary to decide that question in this review. Second, we are in disagreement with the District of Columbia Circuit's holding in Red Lion, sustaining the Commission's order, inasmuch as we think that the order was essentially an anticipation of an aspect of the personal attack rules which are here being challenged.
 
 
 49
 Second, the Commission relies on the alleged difference between the broadcast press and the printed press to sustain its position that the rules are constitutional. Although the Commission denies that its rules either impose unreasonable burdens on licensees or raise any constitutional difficulties,[42] it does concede that 'it is undisputed that the protections of the First Amendment apply to broadcasting.' But this concession is diluted by the Commission's contention that the broadcast press is entitled to a lower order of first amendment protection than the printed press. The Commission argues (relying on National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943)) that 'since radio is inherently not available to all, its use may be constitutionally regulated in the public interest.'[43] What the Commission urges upon this court is the argument that once the need for some regulation of radio and television licensees is recognized-- to insure that broadcasting facilities are in the hands of those most qualified and to eliminate interference and other technical problems-- it must follow that the Commission's power extends to the promulgation of other kinds of regulations. According to the Commission, a failure to make this concession results in the Commission's inability to impose any regulations, technical or otherwise.[44] This argument begs the question at issue, which is, whether the need for technical, financial, and ownership regulation of radio and television licensees sufficiently distinguishes this group from newspaper publishers so as to warrant sustaining the imposition of burdens on radio and television licensees which would be in flat violation of the first amendment if applied to newspaper publishers.
 
 
 50
 The characteristic most frequently advanced by the Commission to distinguish the printed press from the broadcast press is that radio and television broadcasting frequencies are not available to all. Data comparing the broadcast press and the printed press, however, shows that there are more commercial radio and television stations in this country than there are general circulation daily newspapers.[45] ] In most major metropolitan areas, there are several times as many radio and television stations as there are newspapers.[46]
 
 
 51
 The Commission replies to this data by arguing that the only barrier to the publication of additional newspapers is an economic one, whereas the barrier to the operation of additional radio and television stations is a technical one-- a limitation of available frequencies. For two reasons, the Commission's reply is unpersuasive. First, the fact that a number of allocated radio and television broadcast frequencies remain inoperative suggests that economic barriers also play a significant role in determining the number of operating broadcasters. Second the recent availability of UHF television frequencies suggests that technological development is not at a standstill and may result in increasing further the availability of broadcasting frequencies in the future.
 
 
 52
 An additional characteristic is also advanced by the Commission to distinguish the broadcast press from the printed press. Since broadcasting licenses are not available to all and licenses are issued for a limited period of time, the Commission maintains that those who obtain licenses are granted a 'privilege' and consequently must act as 'trustee(s) for the public' since 'the airwaves belong to the public.' Therefore, according to the Commission, a licensee, exercising such a privilege, must abide by Commission imposed rules concerning personal attacks and political editorials.
 
 
 53
 The Commission's reliance on the concept of public ownership of space or airwaves to distinguish the broadcast press from the printed press, is as one commentator has observed: 'Logically * * * meaningless. To say that the airways or spectrum can be owned by anyone is simply to indulge in fantasy.'[47] Carried to its logical conclusion, the concept might sanction inhibitory regulation of other communication media for many such media make use of 'publicly-owned' space to disseminate their respective messages. Moreover, the Supreme Court has indicated that '(A) State cannot foreclose the exercise of constitutional rights by mere labels.' NAACP v. Button, 371 U.S. 415, 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963). The Supreme Court has applied this same principle to attempted infringements of freedom of the press. In one such case, Hannegan v. Esquire, Inc., 327 U.S. 146, 156, 66 S.Ct. 456, 461, 90 L.Ed. 586 (1946), concerning the denial of a second-class postal rate to a magazine, the Court said:
 
 
 54
 Grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever. * * * Under that view the second-class rate could be granted on condition that certain economic or political ideas not be disseminated. * * * (It would be) a radical departure from our traditions * * * to clothe the Postmaster General with the power to supervise the tastes of the reading public of the country.
 
 
 55
 See also Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).[48] Accordingly, the Commission cannot impose unreasonable burdens on a licensee's dissemination of views on controversial public issues by arguing that obtaining and exercising a broadcast license is a 'privilege.'
 
 
 56
 In view of the vagueness of the Commission's rules, the burden they impose on licensees, and the possibility they raise of both Commission censorship and licensee self-censorship, we conclude that the personal attack and political editorial rules would contravene the first amendment. Consequently, the rules could be sustained only if the Commission demonstrated a significant public interest in the attainment of fairness in broadcasting to remedy this problem, and that it is unable to attain such fairness by less restrictive and oppressive means. Keyishian v. Board of Regents, 385 U.S. 589, 602, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed. 231 (1960). We do not believe the Commission has made such a demonstration.
 
 
 57
 According to the Commission, 'The development of an informed public opinion through the public dissemination of news and ideas concerning the vital issues of the day is the keystone of the Fairness Doctrine' as well as the rules here in question. The Commission assumes, however, that television viewers and radio listeners are in fact ill-informed, of communication, and that those other media do not fully inform them of all sides of controversial public issues. We do not believe this assumption is warranted. The Commission's rules apply only to controversial issues of public importance and to political candidate editorials. Thus, the rules deal with subjects which are likely to receive thorough exposure and illumination in all media of communication. Although we would agree that radio and television are major vehicles for the dissemination of views on controverisal public issues, the Commission has failed to demonstrate that the exposure of all sides of a given issue is not achieved by radio and television in conjunction with other media of communication.
 
 
 58
 An important reason advanced by the Commission for promulgating the personal attack and political editorial rules was to broaden the range of available sanctions to deal with licensees who fail to comply with the requirements of the Fairness Doctrine. In its initial memorandum opinion, however, the Commission disclaimed any intention of using the rules 'as a basis for sanctions against those licensees who in good faith seek to comply with the personal attack principle.'[49] When this disclaimer is added to the Commission's failure to demonstrate the existence of widespread noncompliance with the doctrine, it becomes evident that the Commission's rules are broader than necessary; for they impose substantial burdens on all licensees in the expectation of dealing more severely with a minority of licensees who engage in 'willful or repeated' acts of unfairness.[50] In addition, there is some question whether the reply requirements of the rules are wellsuited for attaining the fair presentation of all sides of controversial public issues which the Commission believes to be presently lacking. One commentator, considering the efficacy of the reply requirements, has observed:
 
 
 59
 I think that the case for the value of the broadcast reply is much weaker than it is assumed to be. Most attacks as I have said are received casually and without advance preparation by the listener. After he has heard it, will he be conditioned to expect, wait for, be alerted to a reply? How will themandatedreply or defense reach him? Does he know whether or when it will be broadcast? The advance programs do not give notice of specific replies (though it would be possible for the regulation to require such notice). It may seem something of a paradox but I would hazard the hypothesis that a reply in a newspaper, iE., as a news item, is more likely to reach a listener than the later program. The newspaper both in time and space has greater extension and great permanency. JAFFE, THE FAIRNESS DOCTRINE, EQUAL TIME, REPLY TO PERSONAL ATTACKS, AND THE LOCAL SERVICE OBLIGATIONS; IMPLICATIONS OF TECHNOLOGICAL CHANGE 2 (U.S. Government Printing Office, 1968).
 
 
 60
 The petitioners also challenge the personal attack and political editorial rules on the ground that Congress has not authorized the Commission to promulgate them. They argue that the required explicit Congressional authority, essential in 'areas of doubtful constitutionality,' Greene v. Mc.Elroy, 360 U.S. 474, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), is lacking. And even if it could not be determined that the rules clearly abridge first amendment safeguards, they urge that sufficient constitutional doubt remains to invalidate the rules pursuant to the principle enunciated in Greene v. McElroy.
 
 
 61
 The Commission has reaponded to this argument by calling attention to two provisions which it claims authorize the promulgation of the rules in question. First, it points to the 'public interest' standard contained in the Communications Act, from which it finds the grant of authority to devise rules requiring fairness in the treatment of public issues, citing National Broadcasting Co. Inc. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Second, the Commission maintains that the 1959 amendment of section 315(a) of the Act, clearly and unmistakably conferred upon it authority to refine and implement the Fairness Doctrine which Congress had recognized and approved through the amendment.
 
 
 62
 Since we have determined that the rules here challenged collide with the free speech and free press guarantees contained in the first amendment, we need not resolve the authorization issue presented in this review.
 
 
 63
 The Commission's order adopting the personal attack and political editorial rules, as amended, is set aside.
 
 APPENDIX
 
 64
 The full text of the Commission's rules issued on July 10, 1967 follows:
 
 
 65
 Personal attacks; political editorials.
 
 
 66
 (a) When, during the presentation of views on a contoversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group, the licensee shall, within a reasonable time and in no event later than one week after the attack, transmit to the person or group attacked (1) notification of the date, time and identification of the broadcast; (2) a script or tape (or an accurate summary if a script or tape is not available) of the attack; and (3) an offer of a reasonable opportunity to respond over the licensee's facilities.
 
 
 67
 (b) The provisions of paragraph (a) of this section shall be inapplicable to attacks on foreign groups of foreign public figures or where personal attacks are made by legally qualified candidates, their authorized spokesmen, or those associated with them in the campaign, on other such candidates, their authorized spokesman, or persons associated with the candidate in the campaign. Note: In a specific factual situation, the fairness doctrine may be applicable in this general area of political broadcasts. See, Section 315(a) of the Act (47 U.S.C. 315 (a)); Public Notice: Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 Fed.Reg. 10415.
 
 
 68
 (c) Where a licensee, in an editorial, (i) endorses or (ii) opposes a legally qualified candidate or candidates, the licensee shall, within 24 hours after the editorial, transmit to respectively (i) the other qualified candidate or candidates for the same office or (ii) the candidate opposed in the editorial (1) notification of the date and the time of the editorial; (2) a script or tape of the editorial; and (3) an offer of a reasonable opportunity for a candidate or a spokesman of the candidate to respond over the licensee's facilities: Provided, however, That where such editorials are broadcast within 72 hours prior to the day of the election, the licensee shall comply with the provisions of this subsection sufficiently far in advance of the broadcast to enable the candidate or candidates to have a reasonable opportunity to prepare a response and to present it in a timely fashion.
 
 
 69
 The full-text of the Commission's amendment ot the rules issued on August 9, 1967 follows:
 
 
 70
 (b) The provisions of paragraph (a) of this section shall be inapplicable (i) to attacks on foreign groups or foreign public figures; (ii) where personal attacks are made by legally qualified candidates, their authorized spokesmen, or those associated with them in the campaign, on other such candidates, their authorized spokesmen, or persons associated with the candidates in the campaign; and (iii) to baona fide newscasts or on-the-spot coverage of a bona fide news event (but the provisions shall be applicable to any editorial or similar commentary included in such newscasts or on-the-spot coverage of news events).
 
 
 71
 Note: The fairness doctrine is applicable to situations coming within (iii), above, and, in a specific factual situation, may be applicable in the general area of political broadcasts (ii), above. See, Section 315(a) of the Act, 47 U.S.C. 315(a); Public Notice: Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance. 29 Fed.Reg. 10415.
 
 
 72
 The full text of the Commission's amendment to the rules issued on March 29, 1968 follows:
 
 
 73
 (b) The provisions of paragraph (a) of this section shall not be applicable (i) to attacks on foreign groups or foreign public figures; (ii) to personal attacks which are made by legally qualified candidates, their authorized spokesmen, or those associated with them in the campaign; and (iii) to bona fide newscasts, bona fide news interviews, and on-the-spot coverage of a bona fide news event (including commentary or analysis contained in the foregoing programs, but the provisions of paragraph (a) shall be applicable to editorials of the licensee).
 
 
 74
 Note: The fairness doctrine is applicable to situations coming within (iii), above, and, in a specific factual situation, may be applicable in the general area of political broadcasts (ii), above. See, Section 315(a) of the Act, 47 U.S.C. 315(a); Public Notice: Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance. 29 Fed.Reg. 10415. The categories listed in (iii) are the same as those specified in Section 315(a) of the Act.
 
 
 
 [1]
 These petitioners are Radio Television News Directors Association, Bedford Broadcasting Corporation, Central Broadcasting Corporation, The Evening News Association, Marion Radio Corporation, RKO General, Inc., Royal Street Corporation, Roywood Corporation, and Time-Life Broadcast, Inc. This group of petitioners will be collectively referred to hereafter as RTNDA
 
 
 [2]
 Commissioner Bartley dissented, Commissioner Loevinger concurred and Commissioner Wadsworth was absent
 
 
 [3]
 The rules as set forth in the July 10 order appear in the appendix to this opinion
 
 
 [4]
 Three amicus curiae briefs were filed in this court. The briefs of King Broadcasting Company and the National Academy of Television Arts and Sciences opposed the Commission's rules. The brief of the Office of Communication of the United Church of Christ and other religious organizations favored the Commission's rules
 
 
 [5]
 Times-Mirror Broadcasting Co. (KTTV), 24 P & F Radio Reg. 404 (1962). During the 1962 California gubernatorial campaign, a television station engaged in the "continuous' and 'repetitive' * * * presentation of views * * * on the campaign as compared to a 'minimal opportunity afforded to opposing viewpoints' and * * * from time to time, 'personal attacks on individuals and groups involved in the * * * campaign'.' 24 P & F Radio Reg. at 405. The Commission informed the licensee:
 'Under the fairness doctrine, when a broadcast station permits, over its station facilities, a commentator or any person other than a candidate to take a partisan position on the issues involved in a race for political office and/or to attack one candidate or support another by direct or indirect identification, then it should send a transcript of the pertinent continuity in each such program to the appropriate candidates immediately and should offer a comparable opportunity for an appropriate spokesman to answer the broadcast.' Id.
 However, the Commission indicated that newscasts, news interviews, news documentaries, and on-the-spot coverage of news events 'would not, as a general matter * * * appear to be encompassed by the Commission's ruling.' Id. at 406.
 
 
 [6]
 The specific language in the report which gave birth to the personal attack aspect of the Fairness Doctrine follows:
 It should be recognized that there can be no one all embracing formula which licensees can hope to apply to insure the fair and balanced presentation of all public issues. Different issues will inevitably require different techniques of presentation and production. The licensee will in each instance be called upon to exercise his best judgment and good sense in determining what subjects should be considered, the particular format of the programs to be devoted to each subject, the different shades of opinion to be presented, and the spokesmen for each point of view. In determining whether to honor specific requests for time, the station will inevitably be confronted with such questions as whether the subject is worth considering, whether the viewpoint of the requesting party has already received a sufficient amount of broadcast time, or whether there may not be other available groups or individuals who might be more appropriate spokesmen for the particular point of view than the person making the request. The latter's personal involvement in the controversy may also be a factor which must be considered, for elementary considerations of fairness may dictate that time be allocated to a person or group which has been specifically attacked over the station, where otherwise no such obligation would exist.
 
 
 [7]
 That portion of the 1959 amendment to which the Commission referred follows (47 U.S.C. 315):
 Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
 
 
 [8]
 In particular, the Commission referred to the Public Notice of July 26, 1963; Controversial Issue Programming, F.C.C. 63-734 and Public Notice: Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 Fed.Reg. 10415 (1964)
 
 
 [9]
 On January 29, 1968, the Supreme Court entered an order postponing the oral argument in Red Lion pending the decision of this court in the instant review and the Supreme Court's action on any petition for certiorari to review this court's decision, 390 U.S. 916, 88 S.Ct. 848, 19 L.Ed.2d 977 (1968). On the same day, the Supreme Court denied the petition of RTNDA for certiorari before the judgment of this court, 390 U.S. 922, 88 S.Ct. 857, 19 L.Ed.2d 982 (1968)
 
 
 [10]
 This exemption also included attacks by a candidate's authorized spokesmen or campaign associates on opposing candidates, their spokesmen or their campaign associates
 
 
 [11]
 In pertinent part, section 315 reads:
 (a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: Provided, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is hereby imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any--
 (1) bona fide newscast,
 (2) bona fide news interview,
 (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
 (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),
 shall not be deemed to be use of a broadcasting station within the meaning of this subsection.
 
 
 [12]
 The Commission elaborated on the phrase 'reasonable opportunity to respond' in its memorandum opinion:
 The phrase 'reasonable opportunity' to respond is used here and in the personal attack subsection because such an opportunity may vary with the circumstances. In many instances a comparable opportunity in time and scheduling will be clearly appropriate; in others such as where the endorsement of a candidate is one of many and involves just a few seconds, a 'reasonable opportunity' may require more than a few seconds if there is to be a meaningful response.
 
 
 [13]
 The provision allowing the spokesman of the candidate to make the response was intended to enable the licensee 'to avoid any Section 315 'equal opportunities' cycle' which might be initiated if the candidate himself responded
 
 
 [14]
 The rules issued on July 10, 1967 were to become effective on August 14, 1967
 
 
 [15]
 Commissioners Bartley, Loevinger, and Wadsworth were absent. Commissioner Cox concurred in the result
 
 
 [16]
 The respective petitions for review were supplemented to take account of the August 7 order
 
 
 [17]
 The amendment as set forth in the August 7 order appears in the appendix to this opinion
 
 
 [18]
 The Commission's motion was filed on March 4, 1968. As originally presented, the motion requested that this court hold the pending petitions for review in abeyance and authorize the Commission to conduct further rule making proceedings. According to the motion, the Commission proposed to 'set aside those parts of the rules * * * dealing with personal attacks' and 'to conduct an expeditious rule making proceedings looking toward their revision.' The motion was apparently prompted by consultation between the Commission and the Department of Justice and a letter from the Assistant Attorney General, Antitrust Division, to the Commission's chairman. In pertinent part, the letter read:
 We are fully prepared to support the Commission's position that the 'fairness doctrine' is constitutional and within the Commission's statutory powers, and that, as a general proposition, some special rule with regard to personal attack is a valid facet of that doctrine. However, we have some concern that the rule, as drafted, raises possible problems that might be minimized by appropriate revisions in the rule without materially interfering with the publice interest objectives that the rule is intended to serve.
 The motion was opposed by NBC. Neither RTNDA nor CBS had any objection to granting the motion so long as the enforcement of the rules, as originally promulgated, was stayed pending the proposed revision. In its reply, the Commission abandoned its plan to conduct additional rule making proceedings and instead appended a proposed memorandum opinion and order, revising the personal attack rules. This court's order of March 22, 1968 denied the Commission's motion to hold the review in abeyance but allowed the Commission leave to revise the personal attack rules.
 
 
 [19]
 Commissioners Bartley and Loevinger dissented, the latter writing a lengthy opinion setting forth views critical of the Commission's action. Commissioner Cox concurred. Commissioner Johnson concurred in the result
 
 
 [20]
 The amendment as set forth in the March 29 order appears in the appendix to this opinion
 
 
 [21]
 The Commission did, however, attempt to impart some clarity to the requirements of the personal attack rules. In a footnote, the Commission said:
 Some other matters simply call for a common sense reading of the rule. Thus, if the person attacked has previously been afforded a fair opportunity to address himself to the substance of the particular attack, fairness and compliance ance with the rule have clearly been achieved. Similarly, as shown by the introductory phrase, 'when, during the presentation of views on a controversial issue of public importance * * *.' the rule is applicable only where a discussion of a controversial issue of public importance contains a personal attack which makes the honesty, integrity, or character of an identified person or group an issue in that discussion.
 
 
 [22]
 See note 11, supra
 
 
 [23]
 Throughout its memorandum opinion, the Commission emphasized the parallel between its action and the 1959 Amendments. At one point the Commission said:
 We stress that the program categories being exempted are defined in the 1959 Amendments, and that the legislative guides as to these categories, to the extent pertinent, will be followed in this field also.
 
 
 [24]
 RTNDA not only urges the unconstitutionality of the specific rules here in issue, but of the Fairness Doctrine itself
 
 
 [25]
 Other decisions in which the Supreme Court explored the implications of New York Times are: St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (public official's defamation action after televised speech critical of him); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (public figures' libel action after printed articles critical of them); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (action under right of privacy statute after publication of article concerning newsworthy people and events); Mills v. State of Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (criminal action pursuant to Corrupt Practices Act after publication of a political editorial on election day); and Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (criminal action pursuant to Criminal Defamation Statute after criticism of public officials)
 
 
 [26]
 The amicus curiae brief filed in this court by the King Broadcasting Company graphically illustrates the inhibitory effect on the broadcast of political editorials of the Commission's requirement of a 'reasonable opportunity to respond.' In two instances, the broadcast of editorials endorsing candidates for the Seattle City Council was delayed for several weeks while one of the unendorsed candidates in each instance prosecuted a complaint before the Commission alleging that King's division of that person's reply time was unreasonable. Although not ordering King to give the complaining candidates additional reply time, the Commission determined into how many segments the total amount of time should be divided. This action indicates the degree to which the Commission has gone in imposing supervision on licensees
 
 
 [27]
 The Commission's so-called exemptions from the requirements of the personal attack rules, which were contained in the August, 1967 and March, 1968 amendments, are illusory. Our reading of the latest amendment indicates that unless the response of the person attacked is fairly presented by the licensee on the 'attack issue' of the 'exempt' broadcast, the licensee must adhere to the explicit requirements of the rules. But, the alternative of presenting the reply on the 'attack issue' might lead licensees to view every personal attack as a controversial public issue in order to avoid compliance with the strict requirements of the rules. Because of the possible disruptive effect and difficulty in complying with the alternative, a licensee might choose to avoid controversial issue programming altogether so as to remove the possibility of broadcasting personal attacks
 
 
 [28]
 See note 6, supra
 
 
 [29]
 The Commission referred specifically to 47 U.S.C. 503(b) in this regard in its memorandum opinion issued on July 10, 1967. In pertinent part, that section provides:
 (b) Violation of rules, regulations, etc. * * * (1) Any licensee or permitee of a broadcast station who-- (B) willfully or repeatedly fails to observe any of the provisions of this chapter or of any rule or regulation of theCommission prescribed under authority of this chapter or under authority of any treaty ratified by the United States, shall forfeit to the United States a sum not to exceed $1,000. Each day during which such violation occurs shall constitute a separate offense. Such forfeiture shall be in addition to any other penalty provided by this chapter.
 In addition, a willful and knowing violation of the Commission's rules will subject the violator to criminal sanctions, which are set forth in 47 U.S.C. 502. In pertinent part, that section provides:
 Any person who willfully and knowingly violates any rule, regulation, restriction, or condition made or imposed by the Commission under authority of this chapter * * * shall, in addition to any other penalties provided by law, be punished, upon conviction thereof, by a fine of not more than $500 for each and every day during which such offense occurs.
 Finally, violations of the Commission's rules could subject a violator to administrative sanctions, which are set forth in 47 U.S.C. 312. In pertinent part, that section provides:
 (a) Revocation of station license or construction permit. The Commission may revoke any station license or construction permit-- for willful or repeated violation of, or willful or repeated failure to observe any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States; (b) Cease and desist orders. Where any person * * * (3) has violated or failed to observe any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States, the Commission may order such person to cease and desist from such action.
 
 
 [30]
 In its first memorandum opinion, the Commission said, 'the only new requirement in these rules are the time limits.' A crucial difference between the rules and the Fairness Doctrine, however, is the fact that the licensee's obligations are incorporated in specific rules with which he must comply in every instance under the threat of severe sanctions
 
 
 [31]
 In Mills v. State of Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966), the Supreme Court discussed the vanguard role of the press in the following language:
 Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials * * * responsible to all the people whom they were elected to serve. Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change, which is all that this editorial did, muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free.
 
 
 [32]
 47 U.S.C. 326, prohibiting Commission censorship of program content, provides:
 Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.
 
 
 [33]
 See text supra at 7
 
 
 [34]
 'In appraising a statute's inhibitory effect upon such (first amendment) rights, this Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar.' NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963)
 
 
 [35]
 The latest revision was prompted, according to an Assistant Attorney General, by a 'concern that the rule, as drafted, raises possible problems that might be minimized by appropriate revisions.'
 
 
 [36]
 On previous occasions, the Commission has taken a different view on the rights hof communists under the Fairness Doctrine. of communists under the Fairness Doctrine. Commission stated, 'it is not the Commission's intention to require licensees to make time available to communists or the communist viewpoint.' 29 Fed.Reg. at 10418 (1964). The statement quoted in the text apparently suggests that the Commission has altered its view respecting communists. This apparent change of attitude on the Commission's part, however, indicates only that the Commission has been inconsistent in its application of the Fairness Doctrine. And if the rules are vague enough to require a licensee to seek Commission interpretations, there exists the possibility of further such inconsistencies in the future
 
 
 [37]
 A 'news commentary or analysis' broadcast 'outside one of the exempt program categories' will still be subject to the Commission's rules. Thus, depending solely on when it is broadcast, the same commentary would be either exempt or not exempt. The Commission itself recognized this anomaly, explaining it by saying that the same result occurred under section 315 which it was following
 
 
 [38]
 There is some question whether the Commissions' action in following the 'line drawn by Congress' in section 315 was appropriate. Section 315 dealt with the problem of equal time for political candidates, not with the problem of personal attacks and political editorials. The fact that Congress exempted certain types of news-related programs from the equal time requirement in no way indicates what judgments Congress would have made (if in fact it could constitutionally have acted in this area at all) in deciding the scope of exemptions with respect to personal attacks and political editorials
 
 
 [39]
 For a discussion of the problems of time and planning that attend the preparation of a news documentary, see W. WOOD, ELECTRONIC JOURNALISM, 46-49 (1967)
 
 
 [40]
 The Commission has made clear that 'the obligation for compliance with these rules is on each individual licensee.' If a licensee offers the use of his facilities to others who make a personal attack, the licensee remains responsible for complying with the Commission's rules. Under these circumstances, a licensee might also undertake to censor what others broadcast over his facilities
 
 
 [41]
 See pages 15-18, supra
 
 
 [42]
 In its three memorandum opinions, much of the Commission's discussion of the constitutional impact of its rules, apart from relying on Red Lion, is limited to a cryptic reference in its first memorandum opinion to paragraphs 19 and 20 of the 1949 Report on Editorializing. Those two general paragraphs, written almost twenty years ago, provide no answer to the constitutional issues raised here. Also inadequate are the frequent conclusional statements that the rules neither burden nor inhibit licensees. Categorical conclusions are no substitute for reasoned analysis. Finally, the Commission, in its brief filed in this court, fails to discuss the impact of New York Times and its progeny
 
 
 [43]
 National Broadcasting Co., Inc. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), does not support the Commission's position that the broadcast press is not entitled to the same order of first amendment protection as the printed press. At issue in that case was the validity of the Commission's chain broadcasting regulations. The only constitutional issue raised there was whether the denial of a station license for engaging in certain network practices was a denial of free speech. Moreover, in the earlier case of FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940), the Supreme Court said: 'The Act does not essay to regulate the business of the licensee. The Commission is given no supervisory control of the programs, of business management or of policy.'
 
 
 [44]
 Illustrative of the Commission's argument on this point is the assertion in its brief that 'repeal of the Communications Act would still create chaos.'
 
 
 [45]
 In 1967 there were 6,253 commercial radio and television stations broadcasting as opposed to 1,754 daily newspapers. U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES: 1967, nos. 737, 746 (88th ed.)
 
 
 [46]
 RTNDA has provided us with the following chart illustrating this point:
 Standard Metropolitan Daily Broadcasting Stations
 Statistical Areas Newspapers on the Air--AM-FM-TV
--------------------- ---------- ---------------------
Chicago 13 86
Milwaukee 3 32
Indianapolis 9 29
Peoria 2 11
Madison 2 15
Champaign-Urbana 2 12
Green Bay 1 8
 
 
 [47]
 Robinson, The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulations, 52 MINN.L.REV. 67, 152 (1967). Professor Robinson's article, an insightful and, at times, critical analysis of the Commission's regulatory activities, was written after the decision in Red Lion
 
 
 [48]
 The Supreme Court has expressed the view on occasion that in determining the applicability of first amendment safeguards there is no basis for distinguishing among the various communication media. United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); Lovell v. City of Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938)
 
 
 [49]
 The Commission's announced intention to enforce its rules selectively is no substitute for rules narrowly drawn to deal with a specific problem. For despite the disclaimer, a licensee still faces the possibility of suffering the imposition of severe penalties for noncompliance with the rules, thereby chilling the exercise of his first amendment rights
 
 
 [50]
 The sanctions available to the Commission under 47 U.S.C. 312, 503(b) require willful or repeated violations by a licensee. The sanctions available under 47 U.S.C. 502 require a willful and knowing violation by a licensee