M. Stanton EVANS, Plaintiff,

v.

AMERICAN FEDERATION OF TELE-
VISION AND RADIO ARTISTS,
Defendant.

William F. BUCKLEY, Jr. and National
Review, Inc., Plaintiffs,

v.

AMERICAN FEDERATION OF TELE-
VISION AND RADIO ARTISTS,
Defendant.

Nos. 71 Civ. 3920, 71 Civ. 146.

United States District Court,
S. D. New York.

Jan. 23, 1973.

Baker, Nelson & Williams, New York City, by C. Dickerman Williams, New York City, for plaintiffs. Edith Hakola, Washington, D. C., of counsel.

Becker & London, New York City, by Edward Schlesinger and Mortimer Becker, New York City, for defendants.

## OPINION

BRIEANT, District Judge.

These causes have been consolidated at the instance of plaintiffs by an order of this Court (Pierce, J.) made December 3, 1971.

By order to show cause dated March 3, 1972, issued by Judge Tenney, plaintiffs in each action moved for summary judgment to be entered under Rule 56, F.R.Civ.P., "declaring void, illegal and unconstitutional § 8(a)(3) [29 U.S.C. § 158(a)(3)] of the National Labor Relations Act, insofar as that statute may be deemed to authorize defendant's agreements with networks, broadcasters, stations and other employers in the television and radio industry which require or may purport to require plaintiffs . . . to continue to be members of the defendant . . . pay dues . . . and comply with defendant['s] regulations and orders as a condition of the production or broadcasting certain programs known as 'Firing Line', 'Spectrum' and/or other programs on which plaintiffs . . . may appear, and further, declaring that plaintiffs Buck-

ley and National Review, Inc. may continue to make and sell the package show Firing Line and that plaintiffs . . . may continue to appear on television and radio as they see fit, irrespective of continued membership in defendant, the payment by them of . . . dues and their compliance with defendant['s] regulations and orders, all without harassment or interference by defendant . . . and further enjoining defendant . . . from threatening any network, broadcaster, station or other employer in the television and radio industry with any proposed action or otherwise or taking any action by reason of its employment of or intended employment of plaintiffs . . . on any television or radio show, or its use, or intended use, of a package show in which plaintiffs . . . appear, and further enjoining defendant . . . from threatening to take or taking punitive action of any kind whatever against plaintiffs should plaintiffs Buckley and Evans withdraw from membership in defendant . . . or fail to pay dues . . . or comply with any order of defendant . . . ."

By notice of motion dated May 3, 1972, defendant also moved for summary judgment dismissing the complaints and the consolidated action for "lack of jurisdiction, [and] failure to state a claim against defendant upon which relief can be granted."

Both causes have been at issue for some time. Adequate discovery appears to have been conducted by deposition and interrogatories. With a reservation, not considered significant for purposes of this motion,[1] all parties concede that there are no contested material issues of fact. The Court finds that no contested issues of fact prevent disposition of these motions. Both plaintiffs seek to enforce rights said to be protected pursuant to the First, Fifth and Ninth Amendments to the Constitution of the United States, and more specifically, First Amendment rights.[2]

---

1. See *infra* p. 26, et seq.

2. These actions appear to be within the purview of 28 U.S.C. § 2403, because the

*The Parties*

M. Stanton Evans, plaintiff in 71 Civ. 3920, is a paid radio commentator, or analyst, of news, current events, politics, social, economic, religious, moral and ethical problems—all of the great issues which divide us.[3] Pursuant to written contract with CBS News, a division of the Columbia Broadcasting System which owns and operates radio stations, and furnishes material which may be broadcast pursuant to license by other affiliated stations, Evans, referred to therein as "Artist", on his own responsibility, and not as a "staff employee", writes his own material and selects his own subject matter. He enjoys substantial freedom of expression. While CBS News personnel, in their discretion, may determine whether any program shall be broadcast, CBS may not, without Evans' prior consent, alter Evans' original creative work. Evans, pursuant to the contract, holds CBS harmless for damages and expenses including counsel fees, arising out of the use of any materials furnished by him or words spoken by him [e. g. plagiarism or slander].

The viewpoint and position (or "bias") which Evans reflects is conservative. He alleges that he is ". . . generally considered a spokesman for the conservative point of view on politics and national and international affairs".

Broadcasting is neither his primary nor full-time occupation, which is that of editor of the *Indianapolis* (Ind.) *News*, a substantial daily newspaper. He is a prominent national figure, and is an author of books and essays, a lecturer and debater. It is this independent status, and his standing as an author and lecturer, which creates public interest in his opinions, which are not those of the producer, station or network.

William F. Buckley, Jr., plaintiff in 71 Civ. 146, is a public figure. He has been a candidate for Mayor of New York City and speaks regularly on current events, politics, social, economic and religious subjects. He appears with some frequency on television, and as a paid lecturer. He writes a syndicated newspaper column entitled "On The Right", published three times a week by over 320 newspapers, in which he writes as a commentator and analyst of news, current events, politics, social, economic, religious, moral and ethical problems. He is the principal participant of what he characterizes as a "TV Show" called "Firing Line",[4] and appears often as a guest with or without pay on other tele-

litigation draws in question the constitutionality of an Act of Congress affecting the public interest. This Court, on its own motion, raised the question of applicability of § 2403 of Title 28, which permits intervention of the United States as a party in such an action. After consultation with counsel, this aspect of the litigation was, pursuant to Rule 24 of the General Rules of this District, brought to the attention of Chief Judge Edelstein. On October 18, 1972, Chief Judge Edelstein issued a certificate, pursuant to § 2403, and stayed all further proceedings for a period of thirty (30) days from that date, subject to enlargement of time, so as to permit a motion to intervene. No such motion was made.

The issues have been fully briefed. Defendant is entirely capable of representing the public interest in the action, and the litigation is adversary, and not collusive.

3. For brevity, one following that calling is hereafter referred to merely as a "commentator", or "analyst". Excluded from the definition of commentator are those who merely read news or comments prepared by others, and for which they have no substantial editorial responsibility. Also excluded, unless the context indicates otherwise, are those who comment only on such uncontroversial subjects as the weather, and with respect to whom no personal First Amendment rights could be asserted.

4. The Court has never watched "Firing Line", but accepts plaintiff's description of this program as essentially serious, and issue oriented, rather than mere entertainment. While a "show" is defined as a "theatrical production", it also includes "[any] radio, or television program" and "any kind of public exhibition or exposition". See Random House Dictionary of the English Language, p. 1320, New York 1966.

vision programs, particularly television panel discussions of public events and issues.

He has written magazine articles and books. It is difficult to state with certainty what his primary or full-time occupation is; however, he serves as editor of a magazine, "National Review", and, like Evans, is probably not engaged in broadcasting as his primary or full-time occupation.

Buckley too, is a conservative. He has submitted on the motion a description of his professional standing prepared by Professors Leonard W. Levy and Arthur Young, General Editors of the American Heritage series of books as a foreword to the book "Did You Ever See a Dream Walking?", an anthology of American conservative opinion of which Buckley was the editor. Professors Levy and Young write in relevant part:

"Mr. Buckley is the foremost expositor of rational, humanistic conservative thought in America today. He is a man for all conservative seasons: author, politician, TV star, popular lecturer and editor-in-chief of the nation's leading journal of conservative opinion, *National Review*. In every capacity he is an outstanding educator, though not an academician. Famed as a tough-minded adversary, an entertaining and brilliant conversationalist, and a scintillating stylist, he is also an enormously learned man and a serious thinker. His introduction to this book is written with his characteristic charm, wit, ego, trenchancy, and, of course, strong bias . . . Mr. Buckley is eclectic. . . . He flatly rejects the intolerant and rigid dogmatism of Ayn Rand, the extreme and unrealistic anti-statism of conservatives who verge on anarchism, and the apoplectic and reckless reactionarism (sic) of the John Birchers with their conspiracy theories. Mr. Buckley's conservatism shares nothing in common with the conservatism of Big Business or of the self-appointed super-patriots, bigots and xenophobes."

Plaintiff National Review, Inc., of which Buckley is President, and sole shareholder, is a co-producer of "Firing Line", together with RKO General, Inc., a broadcaster. "Firing Line" is a regular television program known in the television industry as a "package show" because it is produced and broadcast pursuant to contract. On about March 31, 1971, Southern Educational Communications Association ("SECA"), supplanted RKO General as to future Firing Line programs, under a new contract between National Review and SECA, pursuant to which Firing Line was to be produced for distribution to over 200 non-commercial TV stations, by SECA, whose performance was guaranteed by the Corporation for Public Broadcasting.

Production originally took place in New York, but later, by contract, production was effectuated in numerous places, and at various television studios or stations throughout the United States.

Defendant American Federation of Television and Radio Artists ("Aftra") is an unincorporated association organized under the laws of the State of New York and affiliated with the AFL–CIO. It is in essence a labor union, or collective bargaining agent, for artists engaged in the fields of radio and television. It has locals in New York and in many other places throughout the country where television and radio productions originate.

*Facts*

■ Aftra is, and for many years prior to 1967 was, a collective bargaining agent, and is a "labor organization" as defined by the National Labor Relations Act. [29 U.S.C. § 152(5).][5]

---

5. The statute reads in part as follows:
 "(5) The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

Wherever permitted by state law, Aftra has bargained for, and obtained, union shop conditions, with RKO General, Inc., Columbia Broadcasting System and many other television and radio producers, networks and broadcasters. These contracts incorporate by reference, as in the nature of a contract of adhesion, a so-called "Code of Fair Practice". Section 84 of Aftra's Code of Fair Practice for the television industry reads in relevant part as follows:

"84. Union Shop

Until and unless the union security provisions of the Labor Management Relations Act, 1947, as amended, are repealed or amended so as to permit a stricter union security clause the following provisions shall apply:

'It is agreed that during the term of this agreement, we will employ and maintain in our employment only such persons covered by this agreement as are members of the American Federation of Television and Radio Artists in good standing or as shall make application for membership on the thirtieth (30th) day following the beginning of employment hereunder or the date of execution of this agreement, whichever is the later, and thereafter maintain such membership in good standing as a condition of employment.'

In the event the said Act is repealed or amended so as to permit a stricter union security clause the above provision shall be deemed amended accordingly. The provisions of this paragraph are subject to said Act."

This provision has been in effect for some years and is specifically authorized in New York and elsewhere by § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), which reads in relevant part as follows:

" § 158. Unfair labor practices

(a) It shall be an unfair labor practice for employer—

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, . . . *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization . . . if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

\* \* \* \* \* \*

(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; . . ."

Aftra also has a Code of Fair Practice for radio broadcasting, as distinguished from television broadcasting. This Code, applicable to plaintiff Evans by Section 57 thereof, provides for union shop conditions in terms substantially identical to that imposed in the television industry.[6]

For some time prior to November 16, 1966, the provisions of the Aftra televi-

---

6. See, *e. g.,* §§ 55 and 57 of Aftra 1969–72 National Code of Fair Practice For Commercial Radio Broadcasting, Exhibit 5, deposition of plaintiff Evans, page 25.

sion codes defined the "People Covered", artists for whom Aftra was the collective bargaining agent, in a manner which would have excluded plaintiffs. Section 11 of the 1950 Code read in part as follows:

11. PEOPLE COVERED:

All persons engaged as talent, e. g., actors; comedians; masters-of-ceremonies; quiz masters; disc jockeys; singers; dancers; announcers, (other than staff duties of staff announcers); sportscasters; specialty acts; walk-ons; extras; puppeteers; reporters and analysts (with the exception of government employees and persons who are engaged occasionally on a single program basis because they are specialists whose regular employment or activity is in the field in which they report, such as college professors and scientists) in the fields of home economics, fashions, farm and rural subjects, and market reports; models; moderators; members of panel where format of program requires such persons to participate generally in entertainment. *Excluded from the provisions of this agreement are members of panel who take part in discussion of news, education, or public affairs programs, or persons who act only as judges of contests.* (Underlining Added)

The above provision was found in the first television contract, effective December 8, 1950, entered into by Television Authority [which later merged with American Federation of Radio Artists ("Afra") to form "Aftra"] with the network companies and other producers of television programs.

Beginning with the 1956–1958 Aftra Code of Fair Practice for Network Television Broadcasting, an effort was made to distinguish services rendered in the field of news by commentators and analysts from the services performed by others who were not employed as commentators or analysts.

The coverage provisions of the Code effective 1963–1966, read in part as follows:

75. PEOPLE COVERED:

Excluded from the provisions of this agreement are members of panel who take part in discussion of news, education, or public affairs programs, or persons who act only as judges of contests.

This Code also applies to all persons rendering services in the field of news including but not limited to persons who criticize, review and/or comment on the following: books, the fine arts, music, sports, the theatre, movies, dance, radio, television, society, and travel, and including persons who perform in live, film, or recorded news inserts in network television programs. However, commentators and analysts in the field of news (other than persons who criticize, review and/or comment as set forth in the preceding sentence) are excluded from the coverage of this Code on any program upon which they are performing (among other services in the field of news) services in the capacity of commentator and analyst; this exclusion shall apply to services in the field of news performed by a commentator or analyst on a program series in the field of news where such services as analyst or commentator (other than as a person who criticizes, reviews and/or comments as set forth in the preceding sentence) are performed on a substantial number of the programs on which the commentator or analyst so performs on such series.

By the Code effective November 16, 1966 (1966–1969 Code) coverage extended to all persons other than staff newsmen rendering services in the field of news, expressly including commentators and analysts, ending the prior distinctions that had been made. Its Section 75 reads in part as follows:

75. PEOPLE COVERED:

Excluded from the provisions of this agreement are members of panel who take part in discussion of news, education, or public affairs programs, or persons who act only as judges of con-

tests; provided that services of staff newsmen on such panel programs shall be subject to their respective staff agreements.

This Code also applies to all persons other than staff newsmen rendering services in the field of news including but not limited to commentators and analysts and persons who criticize, review and/or comment on the following: books, the fine arts, music, sports, the theatre, movies, dance, radio, television, society, and travel; and including persons who perform in live, film, or recorded news inserts in network television programs. However, management personnel delivering editorials are excluded from the coverage of this Code.

The same coverage pertaining to commentators and analysts rendering services in the field of news is contained in the 1969–1972 Code, and in the staff newsmen's agreement entered into by Aftra with the network companies. It remains effective.

Plaintiffs contend that the industry Codes of Fair Practice imposed on them by Aftra as a result of contracts with employers, constitute *per se* an unreasonable prior restraint on their freedom of speech, guaranteed by the First Amendment to the United States Constitution. They assert that they are exposed to union discipline. Provisions of the Aftra constitution imposing this discipline read in relevant part as follows:

"Any member who shall be guilty of an act, omission, or conduct which in the opinion of the Board is prejudicial to the welfare of the Association, or of any of its Locals, or of any of its members, as such, or any member who shall fail to observe any of the requirements of the Constitution, or of any By-Laws, rules, regulations or others lawfully issued by the Association, any Local or any duly authorized committee or agent of said Association or Local, or any member who shall in any way be indebted to the Association or any Local thereof, may,

in the discretion of the Board, be either fined, censured, suspended or expelled from membership. The Board may discipline a member for each and every offense or violation, and no member shall be exempt from disciplinary action because of any previous action of the Board upon some other or different charge." (Article XVIII, Sec. 1)

In addition, the New York Local of Aftra, [and presumably other locals] imposes on members the following obligations as found in Article X of the Aftra New York Constitution, which reads in relevant part as follows:

"[The Local may] . . . order its members to refrain for a given time or until further order of the Local Board under specified conditions or in any manner whatsoever from working for, dealing with, or having any business relations with any one · or more employers, producers, networks, stations, advertising agencies, sponsors, independent packagers, transcription companies, phonograph recording companies, agents, managers, impressarios or other persons connected with the radio, television, phonograph record business."

Plaintiffs view this element of union discipline, and the entire matter of being required to join a union in order to express their own opinions and to present analysis and commentary having a conservative bias, as unlawful and constituting an unreasonable prior restraint and also as having a chilling effect on their First Amendment rights. We are thus tendered the issue as to whether this union jurisdiction, achieved through Act of Congress (*supra*, p. 830) is unconstitutional as applied to plaintiffs' segment of radio and television employment.

As previously noted, the first television contract, effective December 8, 1950, made by Aftra's predecessor with the network companies and other producers of television programs, contained a "People Covered" provision which de-

fined those members of the collective bargaining unit as persons engaged as "talent". Excluded from coverage as "talent", and therefore not defined as "artists" were those persons who "are members of panel who take part in discussion of news, education or public affairs programs".

The affidavit of Kenneth Groot, Executive Secretary of Aftra's New York Local, which affidavit is sworn to April 26, 1972, points out that "as the news bulletins, newscasts, news programs and news documentaries became increasingly important in television, the network companies contended that the commentators and analysts in the field of news should be excluded from the scope of the contract 'because the requirement of union membership might somehow infringe their right to speak freely'."

Mr. Groot observes that the exclusion of news commentators and analysts from the coverage of the collective bargaining agreements "took on extra significance because producers began to classify ordinary news reporters as analysts to keep them out of the bargaining unit".

Such technique is not unheard of in industrial unionism, where employers attempt to exalt production workers into "foreman" or "management" status, so as to exclude them from the bargaining unit and prevent them from voting in recognition elections.

We think, however, that this threat to union security could have been met by making factual determinations on an *ad hoc* basis; management permitting an announcer or reporter the opportunity to disgorge an occasional *ad lib* will not make him a commentator or analyst. Reasonable administration of the prior union contract should have avoided this difficulty.

Effective November 15, 1966, as Mr. Groot's affidavit notes, the National Code of Fair Practice for network television broadcasting was made applicable to all persons other than staff newsmen rendering services in the field of news. Expressly included were commentators and analysts. Staff newsmen, as distinguished from free lance newsmen, also became covered under separate agreements.

We must remember the admonition that "We are not to 'shut our minds' as judges to truths that 'all others can see and understand.' " [7]

It is obvious that these changes in the persons included in the collective bargaining unit were arrived at as a result of collective bargaining between Aftra and its membership on the one hand, and the employers, broadcasters and producers on the other. Such bargaining presumes a *quid pro quo*. Whether the employers gave up the prior exclusions enjoyed with respect to commentators in order to gain some economic benefit for themselves in some other aspect of their labor relations is of no great importance. The public, and those who would be commentators and analysts enjoying full First Amendment rights, were not participants in, nor are they barred by the results of such bargaining, in which the employers, on plaintiffs' theory of the case, sold out the freedom from prior union restraint previously enjoyed by a limited group of news commentators and analysts.

Interestingly, at the same time, the employers bargained for freedom from union discipline on the part of those per-

7. This quotation was attributed to Chief Justice Taft by (then) Judge Cardozo, in McGovern v. City of New York, 234 N.Y. 377, 392, 138 N.E. 26, 32 (1923), who there referred to Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817 (1921). In *Bailey*, the Supreme Court, referring to a tax on the employment of child labor, wrote, per Chief Justice Taft:

"[A] court must be blind not to see that the so-called tax is imposed to stop the employment of children within the age limits prescribed. Its prohibitory and regulatory effect and purpose are palpable. All others can see and understand this. How can we properly shut our minds to it?"

sons characterized as "management personnel" who merely read the expressions of editorial opinion written by the owners.[8]

Both Aftra and the employers with whom these plaintiffs have had dealings interpret the Code to include commentators and analysts who express their own philosophical bias [who, in effect, editorialize in support of their own opinions, rather than for the opinions of ownership, as the exempted employees do], as being within the bargaining unit. They are persons for whom full membership in Aftra and compliance with union discipline is a condition precedent to speech, at least in New York and many other states.

Additional contracts between Aftra and producers prevent use of unionized production facilities for creating tape to be rebroadcast on non-union stations, and further provide that an independent (non-network, non-station) producer must require membership on the part of the "People Covered" by the Aftra Code, or else his independent production may not be broadcast on unionized stations.

*Plaintiffs Become Members of Aftra*

As noted, written agreements binding upon CBS News, Inc. and Aftra require, among other things, that persons employed to do plaintiff Evans' work, must become and remain members of Aftra. The contract of employment between CBS News, Inc. and Evans, and his prior contract (¶ 18), provide that Evans is "bound by all the terms and provisions of the applicable Aftra National Code of Fair Practice for commercial radio broadcasting" and "will become a member of Aftra in good standing, subject to and in accordance with the provisions of said applicable Aftra Code or Agreement" and "will become and remain during the term of this agreement, a member in good standing of any labor unions or guilds with which CBS may at any time have agreements then in effect lawfully requiring such membership."

Breach of this, or other covenants of the written employment agreement are agreed grounds for reduction of compensation, or termination (¶ 19).

Evans has testified at his deposition read in support of the motion, without contradiction, that he negotiated his employment directly with a Vice President of CBS News, Inc. His mimeographed form contract contains changes and deletions made in ink. In the course of his contract negotiations, Evans was told by CBS Vice President Robinson that he would have to join Aftra. After Evans protested, Robinson advised that CBS had a contract with Aftra by reason of which CBS was required to compel Evans to join Aftra; that if he refused to join Aftra CBS simply could not engage him.

In order to obtain the employment and the opportunity to express his conservative views by radio, Evans applied for membership in, and joined Aftra.

The conduct of the CBS officer in this circumstance is nothing more than would be expected in view of the existing labor agreements. The employer had contracted in good faith that it would require all persons in Evans' area of endeavor to become members of the union within 30 days after employment. The contracting parties, including Aftra, intended that what was done, would be done by the employer, in precisely the way in which it was done. Counsel for Evans termed this "coercion".

I find that plaintiff Evans had a good faith objection to joining the union, based upon his contention that it is unconstitutional to require him to do so and in derogation of his First Amendment and related rights. He would not have joined but for the fact that Aftra bargained for and received adherence

---

8. Aftra 1966–69 Code, see supra p. 831, last sentence of quotation. Of course, we cannot conclude that the sole reason the station owners bargained for and received exemption for "management personnel delivering editorials" is to protect ownership's First Amendment rights.

by CBS News, Inc. to the Code aforementioned.

Buckley did not attain membership in Aftra under such simple factual circumstances. Briefly described, however, Buckley's membership, like that of Evans, was effected against his scruples, and only in order to permit him to continue to express to the public his commentary and analysis from a conservative bias. Plaintiffs' motivation in joining Aftra was not unlike that of the conversion of Henry of Navarre.

Buckley commenced his television appearances in or shortly after 1955. His early appearances were generally without compensation. In about 1964, the increasing public attention which he was receiving, and the fact that a proposed program discussing matters of public interest with Buckley as host and moderator was under consideration, resulted in an invitation from Mr. Kenneth Groot, Executive Secretary of Aftra, dated August 27, 1964, to become a member.

On September 1, 1964, Buckley, apparently early determined to sustain his First Amendment claim presently in litigation in this action, wrote and inquired whether he was free to join or not join, and asked what the sanctions used against him would be in the event he should "opt" not to join.

Mr. Groot, in an entirely courteous letter of September 3, 1964, responded, conveying the details of membership application, initiation fee and dues and advised "since Aftra has a union shop in all of its collective bargaining agreements, it is necessary that persons who appear on radio or television in Aftra covered employment be members . . . within the period prescribed by law."

Mr. Groot's letter was a fair summary of the legal effect of the Code and labor contracts upon Buckley, who replied by letter on September 22, 1964 "I have apparently no alternative than to join your union, I shall proceed to do so under protest." He states thereafter that on May 14, 1965, while appearing on a television program, an unidentified "organizer" for Aftra tendered an application form and advised that he would not be permitted to go on televsion again unless he became a member.

During the period immediately following this alleged attempt to enlist plaintiff in the union as required by the contracts and codes, he became a candidate for the office of Mayor of the City of New York, and no further efforts were made during this period.

In late 1965 and early 1966, apparently an RKO General employee, Yarnell, in connection with the production of the program later known as "Firing Line", took the occasion to remind Buckley of the provisions of the Code of Fair Practice and the agreement between RKO General, Inc. and Aftra which required union membership as a condition of broadcasting. It was Yarnell's duty to perform RKO's agreement with Aftra for union shop conditions. To avoid what Buckley describes as "a long legal battle in the courts" he submitted his application to join Aftra on April 1, 1966.

Prior to submitting the application on April 1, 1966, National Review, Inc. had by agreement with RKO General covenanted to abide by the Aftra Code of Fair Practice and all collective bargaining agreements. These provisions in effect require union shop conditions to be maintained by an independent producer whose work is to be broadcast over any major station or network in New York. (See p. 11 of Buckley's affidavit, sworn to February 16, 1972.) Similar provisions were embodied in subsequent contracts pursuant to which Firing Line was produced.

Section 90 of the Aftra Codes of 1966–1969 and 1969–1972 entitled "Purchase of Package Shows", read in relevant part as follows:

90. PURCHASE OF PACKAGE SHOWS:

"Nothing in this agreement shall be construed as preventing the Producer from buying package shows from fair

independent contractors; provided that the Producer must, in its agreement with the independent contractor, include a provision requiring such contractor to sign, adopt and conform to the '1969–72 AFTRA National Code of Fair Practice for Network Television Broadcasting,' and further provided that such independent contractor becomes a signatory to such Code and a signed copy of the Code is delivered by the Producer or independent contractor to AFTRA not later than 72 hours prior to the first broadcast of the program. AFTRA agrees with the Producer that if an independent contractor has signed this agreement and the Producer has complied with this paragraph, AFTRA will not exercise its right to strike against the independent contractor so as to create program emergencies for the Producer." (Copied from 1969–72 Code)

Buckley also asserts that he was coerced into joining Aftra, and was threatened. Defendant cavils over this choice of words. It is there that we are told issues of fact exist. Defendant's memorandum submitted on the motion (p. 15) contains the following statement:

"Aftra categorically asserts that Mr. Buckley became an Aftra member only under pressure from RKO General. Mr. Evans testified that no representative of the union communicated with him in any way . . . and that he was compelled to become an Aftra member by his employer."

Such compulsion, applied to Evans by the employer, or in Buckley's case, by the customer for the packaged show, in behalf of itself and all other broadcasting outlets, parties to the Aftra Code, occurred by reason of the contract, or collective bargaining agreement, between Aftra and these broadcasters. At the special instance and request of Aftra the broadcasters had agreed to enforce the contract. Mr. Groot properly observed (deposition p. 34) that "the producer who has signed the collective bargaining agreement with Aftra has an equal obli-

gation with Aftra to observe the provisions of it. We would notify such a producer of any failure to observe those provisions which we considered to be a violation, and he would be under an obligation to see that the individual in such a case were a member of Aftra or did join the union." Later, Mr. Groot testified on deposition with respect to a hypothetical question based upon the production of Firing Line that ". . . Yes, we would pursue Mr. Buckley in such a case, and we would also advise RKO of the fact. We would do both. This would be what I would do if I were handling such a matter directly."

Thus it appears that neither Buckley nor Evans could insulate themselves by not accepting employment from the employers having contracts with Aftra. Under the provisions of the Aftra Code, no matter by whom employed or paid, or even if self-employed, any "artist", as defined by the "People Covered" clauses, who appears regularly on any major network radio or television station for pay must become a member of Aftra. Groot testified that he had uniformly had compliance. Such compliance, as noted, extends to use of a station's producing facilities to create tapes not intended to be broadcast on that station, but for broadcast in another station or even in a foreign country, and this whether or not the broadcast outlet itself has such a labor contract. Mr. Groot has asserted that Buckley's work on Firing Line was that of a "moderator" and that he is an "actor" when he appears on other shows.

Further, when National Educational Television and Radio Center ("NET") broadcasts programs produced by or with the support of the "Corporation for Public Broadcasting" (a federally funded entity), Aftra requires, by reason of contractual agreements with NET that such programs likewise comply in all respects with the Code (Groot deposition, p. 60).

As to productions for broadcasts elsewhere, other than in New York, Groot testified that "Whether or not it was broadcast at that station [a station

owned by a producer with whom an Aftra agreement had been executed] or broadcast at stations where we didn't have a contract, we would still obviously control or feel we had a right to enforce our contract with that station where we had a contract, even though it was not made for broadcast there, simply because the provisions of those contracts, as in the case of RKO, do include provisions, by reference, to the syndication of programs." (Groot deposition, p. 70.)

Plaintiffs correctly point out that only evidence, as distinguished from pleadings or statements, serves to raise issues of fact on a motion for summary judgment. Issues of fact may not be brought into existence *ipse dixit*.

The affidavit of William A. Rusher, Vice President of National Review, Inc., sworn to November 5, 1972, clearly shows, without contradiction, that in November, 1970, after a lengthy period of dissatisfaction with Aftra's membership requirement, Buckley contemplated withdrawing from the union or bringing legal action to determine his rights to do so. Rusher then requested Mr. Warren Steibel, associated with National Review, Inc. as the producer of Firing Line, to arrange a conference with the appropriate official of Aftra.

On November 25, 1970, Rusher and Steibel had a 10 to 15 minute meeting with Irving Lewis of Aftra at the union's office in New York City. If Buckley resigned, Lewis there asserted, Aftra would instruct WOR-TV to cease broadcasting Firing Line since Aftra had a contract with WOR-TV wherein the station was forbidden to broadcast work of nonmembers. Lewis explained that Aftra had similar contracts with every other television station in New York, and that Firing Line could not be broadcast in New York at all should Buckley resign from the union.

Lewis was uncertain as to the consequences of possible production in England. However, as noted by Rusher, Lewis "said that he was quite confident that it could not be produced anywhere in the United States if Mr. Buckley were not a member of Aftra, and that Aftra would do its best to prevent the broadcast here of any programs produced in England." Lewis, in response to a question regarding Los Angeles as well, replied that Aftra had contracts with all Los Angeles stations corresponding to its contracts with New York stations.

Lewis noted that Buckley could not limit his Aftra obligations to paying dues and initiation fees. Buckley would also be required to respect an order not to cross a picket line around WOR-TV, and to participate in a nationwide strike of Aftra, if need be. If Buckley were to withdraw from Aftra, Lewis replied that the union would instruct its members not to participate in the production of Buckley's program.

Incontrovertable evidence, including admissions of defendant, shows that Buckley was required by the Aftra Code and contracts with broadcasters ancillary thereto, to become and remain a member of Aftra, against his will. It was made perfectly clear to him that he would be unable to continue to broadcast his opinions and philosophy should he fail to so do. He made a determined effort to elude Aftra, or at least to force Aftra to establish its coercive position as to him, in manner clear enough to permit tendering the issue to this Court and to the public.

Whether the actual transactions between Aftra representatives and broadcasters on the one hand and Buckley on the other leading to his membership involve peripheral issues of controverted fact is immaterial. Buckley and Evans have clearly shown on the record before me that they were forced to apply for and receive membership in Aftra in order to speak on radio and television with respect to their opinions and philosophies. They need not show "threats", or "coercion" in a physical sense.

*Jurisdiction*

Plaintiffs assert their claim *inter alia*, under the relevant portions of the First

Amendment and the Ninth Amendment to the United States Constitution.

The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

■ Plaintiffs found jurisdiction on several grounds. They urge that these are "civil actions wherein the matter in controversy exceeds the sum or value of $10,000.00 . . . and arise[s] under the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331. The cause of action, which states a claim under federal law, literally arises under the Constitution, and a substantial right of the plaintiffs may be defeated by one construction of the Constitution or a federal statute, as opposed to another construction. Gully v. First National Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936); Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1962); Oldland v. Gray, 179 F.2d 408 (10th Cir. 1950), cert. den. 339 U.S. 948, 70 S.Ct. 803, 94 L.Ed. 1362. The circumstances do appear clearly from well pleaded allegations in plaintiffs' complaints.

■ We have no doubt that the matter in controversy exceeds the sum or value of $10,000.00 for jurisdictional purposes. That which is at stake here, the right to continue to offer for sale one's services as a commentator and analyst, is, based on the past financial performance of each plaintiff, of the value of more than $10,000.00. Plaintiffs have every expectation of continuing in their professional efforts so long as there is a public demand for their services. This could be of indefinite duration. The mere fact that in a single calendar year one or both of them may have failed to earn $10,000.00 from radio and television activity does not preclude our finding that the right at stake is of such value.

■ Jurisdiction is also based on § 1337 of U.S.C., Title 28, as a case arising under an Act of Congress relating to commerce (National Labor Relations Act). While the plaintiffs do not assert any right given them under an act of Congress, they seek to test the extent of the rights given defendant under such an act, and asserted against them, in claimed derogation of their constitutional rights. Subject matter jurisdiction has been taken in cases involving disputes as to the extent of union power granted under the National Labor Relations Act, Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1952); Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir. 1971); Seay v. McDonnell Douglas Corp., 427 F.2d 996 (9th Cir. 1970).

■ Persons adversely affected by the results of collective bargaining agreements, which impinge upon their rights secured by the Constitution, have been permitted to seek relief in the District Courts. Steele v. L & N Ry. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1942). They need not exhaust administrative or intra-union remedies. See Seay v. McDonnell Douglas Corp., *supra*; Steele v. L & N Ry. Co., *supra* and Railway Employees Department v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956).

■ As so well stated by Mr. Chief Justice Vinson in American Communications Association v. Douds, 339 U.S. 382, 401, 70 S.Ct. 674, 685, 94 L.Ed. 925 (1950) ". . . when authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself", and therefore justiciable.

Defendant alleges in its answer (¶ 29) to the amended and supplemental complaint in the Buckley case, that it is "empowered to enter into [such] agreements with employers requiring as a condition of employment membership therein . . . pursuant to the provi-

sions of § 8(a)(3) of the N.L.R.A., as amended, 29 U.S.C. § 158."

Presumably, if CBS News had failed to insist that Evans join the union, the union could have called a strike, notwithstanding the outstanding labor contract, or could have instituted suit, or filed an unfair labor practice charge [with the National Labor Relations Board] for failure to perform the bargaining agreement. If union leadership failed to enforce performance of the agreement by management, an aggrieved member of the rank and file may have standing to insist on such performance. 29 U.S.C. § 151 et seq. Furthermore, NET is directly subsidized with federal funds.

 Subject matter jurisdiction will permit declaring the rights or legal relations of the parties seeking such declaration, pursuant to 28 U.S.C. § 2201, if, on the facts, an actual controversy is shown to exist. There is here such an actual controversy. Plaintiffs need not subject themselves to the loss of their valuable contract rights by withdrawing from Aftra, and as a result have their expression of opinion on radio and television stifled. Aftra has made clear that this will result if they do so, and plaintiffs have made clear that they joined only out of necessity, which they style as coercion.

The Court finds jurisdiction over the subject matter and the parties for the purpose of determining the controversy and declaring the respective rights of the parties.

 Defendant casts its attack on the merits of plaintiffs' claim that their First Amendment rights have been "chilled", in terms of an objection to jurisdiction because, it is said, no actual controversy exists. Of course, plaintiffs cannot litigate a philosophical question without showing a stake in the issue. They may not seek "an advisory opinion". The presence of an actual impingement, a threat to, or a chilling effect on their First Amendment rights of free expression must exist as a jurisdic-

tional element of the case. See Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); International Longshoremen's & Warehousemen's Union Local No. 37 v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954); Public Service Commission of Utah v. Wycoff, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); Eccles v. Peoples Bank of Lakewood Village, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948); and United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

Such chilling effect does exist here. See *infra*, p. 842.

*Plaintiffs' Standing to Raise the Constitutional Issue*

 Radio and television stations are, in some but not all respects, a technological extension of the "press", as it was known to the authors of the First Amendment. This is recognized by most Courts. The First Amendment extends, of course, to broadcasting, as well as to other media of expression. See, for example, National Broadcasting Co. v. United States, 47 F.Supp. 940 (D.C. 1942), aff'd. 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

Were the instant issues raised with respect to the press, however, distinctions would appear. The newspapers belong to their owners, and print what the owners will. In editorial comment, the New York Times and the Washington Post may be unreservedly liberal, while the Indianapolis News or the Manchester Union Leader may be unremittingly conservative. We are told that union leadership has not, in the area of the American press, asserted the same control over columnists, editorial writers, commentators and analysts of opinion, such as Buckley and Evans, as is present in this case. Recently, the American Newspaper Guild voted to endorse a national political candidate. The New York Times editorialized (Saturday, July 22, 1972) in part as follows:

". . . the decision of the American Newspaper Guild's Executive

Board to endorse the candidacy of . . . is wrong in principle and mistaken in tactics. The Guild clearly includes members of diverse political viewpoints. The union leadership cannot and should not try to speak for them as if they were a political bloc. Moreover, impartiality and fairness in reporting and editing the news are the central ideals of the news profession, never perfectly attained, but strived for every day. While it is true that the large part of the Guild's membership has nothing to do with preparing, reporting or editing, the union contains enough strictly professional journalists to warrant its avoidance of taking positions on public issues or political personalities. To do otherwise is to cast a shadow of doubt upon the profession's commitment to its own ideals."

Officials of many unions affiliated with AFL–CIO, as is defendant, cause their organizations to take political positions with respect to the endorsement of candidates and with respect to national and state issues. Section 610 of Title 18, U.S.C., as amended by the Federal Election Campaign Act of 1971, expressly authorizes labor organizations to solicit and expend money in connection with a federal election, so long as not secured by physical force, job discrimination, financial reprisals or the threat thereof. In addition, the contributions or expenditures must be from voluntarily financed segregated union funds. See Pipefitters Local Union No. 562 et al., v. United States, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972).

A political philosopher holding himself out to the public as presenting views with sincerity must, of necessity, have the importance attached to his views nullified if it be known that he is a member of an organization which is raising money for contrary positions, and taking adverse stands.

Radio and television differ from the press in that the press is open, at least in theory, to all. Any citizen (if he has Five Million Dollars) is legally free to start a competing newspaper in any of our major cities to set forth his own opinion. A latter day Paine with a mimeograph machine is deemed to have access to the "market-place of ideas" for Constitutional purposes, equal to those who own and control the leading journals of news and opinion. Accordingly, there is no legal requirement for the press to present a "fair" balance of opinion and analysis. Subject only to the laws of libel, there is not even a requirement of truthfulness and accuracy.

The situation is different with respect to radio and television. Frequencies available are limited. Accordingly, access is limited. Licenses issued pursuant to the authority of Congress are in the nature of franchises, allocating the airwaves among those desiring to be heard and seen. Although acquired practically without cost, many licenses have been "sold" for substantial sums. Broadcasting franchises are held in the public interest.

The Federal Communications Commission ("FCC") may not grant or renew a station license, except upon a finding that "public convenience, interest, or necessity will be served thereby" (47 U.S.C. § 307(a) et seq.). One of the essential elements for consideration in determining public necessity is the "quality and *fairness* of the licensee's programming." Hale v. F. C. C., 138 U. S.App.D.C. 125, 425 F.2d 556 (1970).

As stated in Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 369, 89 S.Ct. 1794, 1796, 23 L.Ed.2d 371 (1969):

"The Federal Communications Commission has for many years imposed on radio and television broadcasters the requirement that discussion of public issues be presented on broadcast stations, and that each side of those issues must be given fair coverage. This is known as the fairness doctrine, which originated very early in the history of broadcasting and has maintained its present outlines for some time."

*Red Lion, supra,* holds (p. 375, 89 S. Ct. p. 1798) that the Fairness Doctrine "[E]nhance[s] rather than abridge[s] the freedoms of speech and press protected by the First Amendment", and is constitutional. Also, (pp. 377–378, 89 S. Ct. p. 1800):

"There is a twofold duty laid down by the FCC's decisions and described by the 1949 Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949). The broadcaster must give adequate coverage to public issues, United Broadcasting Co., 10 F. C.C. 515 (1945), and coverage must be fair in that it accurately reflects the opposing views. New Broadcasting Co., 6 P & F Radio Reg. 258 (1950). This must be done at the broadcaster's own expense if sponsorship is unavailable. Cullman Broadcasting Co., 25 P & F Radio Reg. 895 (1963). Moreover, the duty must be met by programming obtained at the licensee's own initiative if available from no other source. John J. Dempsey, 6 P & F Radio Reg. 615 (1950); see Metropolitan Broadcasting Corp., 19 P & F Radio Reg. 602 (1960); The Evening News Assn., 6 P & F Radio Reg. 283 (1950). The Federal Radio Commission had imposed these two basic duties on broadcasters since the outset, Great Lakes Broadcasting Co., 3 F.R. C.Ann.Rep. 32 (1929), rev'd on other grounds, 59 App.D.C. 197, 37 F.2d 993, cert. dismissed, 281 U.S. 706 [50 S.Ct. 467, 74 L.Ed. 1129] (1930); . . ."

As stated in Radio Television News Directors Ass'n v. United States, 400 F. 2d 1002, 1005 (7th Cir. 1969), rev'd. on other grounds, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371:

"The Fairness Doctrine was initially articulated in the Report of the Commission in the Matter of Editorialization by Broadcast Licensees, 13 F.C.C. 1246 (1949). In that report, the Commission stated the basic obligation of licensees to present broadcasts concerning public issues, in a manner which would insure that the listening public would be exposed to a broad spectrum of views on a given issue. The Commission indicated that 'specific Congressional approval' of the Fairness Doctrine was contained in the 1959 Amendments to section 315 of the Communications Act."

Section 315 of 47 U.S.C. referred to in *Radio Television News Directors Ass'n, supra,* reads as follows:

"(a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

(1) bona fide news cast,

(2) bona fide news interview,

(3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. *Nothing in the foregoing sentence shall be consutrued as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance."*

Power to promulgate "such rules and regulations and prescribe such restrictions and conditions . . . as may be necessary to carry out the provisions of this chapter" is conferred on the F.C.C. by 47 U.S.C. §§ 303 and 303(r).

The statutory standard, public convenience, interest and necessity, is "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy", and "to maintain . . . a grip on the dynamic aspects of radio transmission." "Congress moved under the spur of a widespread fear that in the absence of governmental control the public interest might be subordinated to monopolistic domination in the broadcasting field." [Frankfurter, J., in F. C. C. v. Pottsville Broadcasting Co., 309 U.S. 134, 137–138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940).] See also *Red Lion, supra*; National Broadcasting Co., Inc. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Harbenito Broadcasting Co. v. F. C. C., 94 U.S.App.D.C. 329, 218 F.2d 28 (1954); McIntire v. Wm. Penn Broadcasting Co. of Pa., 151 F.2d 597 (3d Cir. 1945), cert. den. 327 U.S. 779, 66 S.Ct. 530, 90 L.Ed. 1007 (1946); Greater Boston Television Corp. v. F. C. C., 143 U.S.App.D.C. 383, 444 F.2d 841 (1970); F. R. C. v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933).

The aforementioned Congressional policies exist primarily for the benefit of the public, or listeners and viewers, but also benefit members of that class of persons available to be hired by broadcasters. There are a limited number of persons in the country situated as are plaintiffs, qualified by education and dogma to be hired to discharge this public duty of fair and balanced presentation of competing viewpoints. Plaintiffs have been so hired. While broadcasters would have standing to claim freedom from any union interference with the discharge of the fairness duty imposed upon them by law, they, in 1967, after a strike, bargained away this right with Aftra, presumably for economic value received, or labor peace equivalent to economic benefit.

We think that Evans and Buckley are so specially situated as to have standing also to assert for themselves, and for the general public, the rights assured by Congress to hear broadcasts of commentary, analysis and political opinion from diverse philosophic viewpoints.

If any system develops pursuant to Congressional authority which chills the First Amendment rights of commentators, the entire public suffers, but those who seek employment as commentators and who are qualified therefor and will not be hired, or will be discharged if they do not submit, have a special personal and economic interest, and state a grievance which we hold is cognizable in this Court.

That which for convenience we call Gilbert's Rule applies here:

I often think it's comical
How Nature always does contrive
That ev'ry boy and ev'ry gal
That's born into the world alive
Is either a little liberal
Or else a little conservative.[9]

A liberal cannot be hired to express news commentary or analysis from a conservative viewpoint, no more than a fundamentalist preacher can be hired to conduct voodoo rites, because such beliefs are highly personal, intrinsic and developed in the entire course of a man's education and his life. Plaintiff and many liberal and conservative commentators are sincerely devoted to the creed they preach. While defendant, with pardonable glee, has cited a column written by plaintiff Buckley, (New York Post, April 25, 1972) taking in another context an unduly restricted view of First Amendment rights, many conservatives are more liberal in respect to rights se-

9. Sir William S. Gilbert, *Iolanthe*, (1882) Act II—Pvt. Willis.

cured by the First and Ninth Amendment than are the liberals, particularly if the exercise of such rights does not involve mass demonstrations or civil commotion. See *e. g.* the determined and unsuccessful effort of another conservative commentator to vindicate his First and Ninth Amendment rights against the demands of the Census Bureau, United States v. Rickenbacker, 309 F.2d 462 (2d Cir.), cert. den. 371 U.S. 962, 83 S.Ct. 542, 9 L.Ed.2d 509 (1963).

■ *Once hired as a commentator* and presented to the public as one who speaks his own sincere opinions and analysis from his own viewpoint or bias, we hold a commentator has First Amendment rights. The employers have recognized this, as appears from the substantial autonomy granted Evans by his contract with CBS News.

To discharge the network's statutory duties, *supra,* CBS News has developed the program known as "Spectrum" upon which Evans appears. We are told that by this format two liberals, two conservatives and two "moderates" speak on topics of their choice, presented in sequential spots with a disclaimer by the broadcaster which attributes the opinion to the speaker, not (necessarily) the station.

While it may not be held that union membership in all circumstances chills First Amendment rights and freedom of expression, we find ample evidence in this present record, of uncontested facts which show an actual chilling of plaintiffs' freedom of expression. The commentator or analyst, hired to express his own opinion has been grouped, in the labor contract, with persons described as "artists" or "talent" who are primarily entertainers, whose expression is guided, at least in part, by a script or scenario. While the union has no hiring hall or seniority list and its membership is open to all who can gain employment on television or radio, joining defendant does require acceptance of a serious and substantial union discipline. The degree and extent of such union discipline is clearly expressed by those provisions which have been discussed supra, at page 831.

Defendant's officials have admitted on deposition that they would require a member such as Buckley or Evans to refuse to broadcast his commentary and opinion in the event of a job action, or in relationship to any producer or broadcaster who has committed an "unfair practice" insofar as concerns the union and in the opinion of the union leadership.

The chilling effect of this is very real; suppose a strike is called, at a time when matters of great public interest are occurring in the nation or in the world, as to which plaintiffs, missionaries of their conservative doctrine, desire to express their opinion and analysis, but they are required to refrain from crossing the picket line of another union or are otherwise forbidden from speaking, on pain of forfeiture?

By Congressional action, these plaintiffs have been required to agree in advance that they would so conduct themselves in a time of crisis. There may be some in this world of uncommitted people, Benthamites, pragmatists and cynics who will sign the membership obligations, pay the dues and hope that they will never be required at some future time to face the issue squarely. To the extent that such persons act with a secret evasion of mind, to sign, pay, and do as they please in the event of a strike, such is not to be required of a philosopher, liberal or conservative.

■ The Court believes that these plaintiffs, and others of liberal persuasion, might under circumstances be required by their principles to violate union discipline and broadcast their commentary and analysis in times of national crisis, even if to exercise their constitutional rights of such free expression of opinion, it were necessary to use the facilities of a proscribed employer, or to cross a picket line or to violate their obligations as union members. It is inconsistent with First Amendment rights for

Congress to force somebody to agree in advance to a limitation on such conduct, and this is what has occurred here. Nor is this issue speculative, or, as described by defendant, "sham, fanciful, frivolous, gauzy, theoretical and specious."

The issue contemplated has actually arisen in the recent past. The only national strike by Aftra against the networks occurred in March, 1967 because of a breakdown in collective bargaining negotiations for the 1966–69 Codes and contracts, pursuant to which for the first time commentators and analysts were expressly included within the bargaining unit.

During that strike, picket lines were established, and union members were directed not to report for work. The strike itself and the surrounding negotiations, including the fact that the bargaining was concerning itself with whether or not commentators and analysts were appropriate members of the bargaining unit, was in itself a proper subject for exercise of First Amendment rights.

One Chester Huntley, then engaged as a liberal commentator by National Broadcasting Company, expressed his opinions in news broadcasts which he continued to make during the strike. He suggested that it was against the public interests for persons such as himself to be involved in organized labor and questioned the validity of the strike, objected to the arbitrary manner in which Aftra had gained jurisdiction over his work, and said that union wage demands by local news personnel, made to the radio and television stations, were unreasonable and would price local news out of the market.

After the strike was over, Aftra sponsored a panel discussion held at the Academy of Television Arts and Sciences in New York on October 18, 1967. As appears from the December, 1967 issue of "Stand By!" at p. 12, marked as Pltf.'s Exhibit 24, in the deposition of Mr. Groot, Huntley again restated his opinion with respect to union contracts for commentators. Mr. Mel Brandt, then National President of Aftra and President of its New York Local, stated his position (p. 16) as follows:

"It was a mistake not to have disciplined Mr. Huntley when he failed to honor Aftra's picket line last April. It may have been the biggest mistake that Aftra ever made in its history. It should never have happened. We were faced with a situation where Aftra had had its first national major strike. It was a new experience for Aftra. We had not served special notice on either the membership or the companies that there would be no waiver of the union's disciplinary rights. We hadn't even considered it. Let's go back to that time: We have a settlement after thirteen days of strike, with defections threatened—and we have a good settlement. It is a deal. We are faced with an alternative. We have asked people to honor our picket line. We have promised them protection. So the first thing we asked for was protection for those people who honored our picket lines. The companies turned around and said: 'Fine. We'll do that, but, in turn, the quid pro quo is that Mr. Huntley, and Mr. McGee and Mr. Scherer and Mr. Beatty must not be disciplined.' They mean it. So do we keep 18,000 members out two more months, three more months? It's an important issue. Do we fail to honor our commitment to protect those who honored our picket lines? We made a soul searching decision. Perhaps it was the wrong decision. In retrospect, I think it was wrong. We should have stayed out another two months if need be and we should have disciplined those members who did not honor our picket lines."

The same Exhibit indicates (p. 14) that the union had levied fines of $48,000.00 against "five of its newest members, with 90 more so I hear to come" (Huntley, as quoted in "Stand By!", speaking at the forum previously mentioned).

The same issue also shows (pp. 9, 10) that 19 named persons had been fined a total of $129,775.00 for failing to comply with an Aftra National Board order to support a sister union known as "Nabet", and not to cross Nabet picket lines. However, there is no indication that any of the persons so fined were commentators or analysts.

Chester Huntley's experience with Aftra is of sufficiently recent date and writ large for all to see. He was saved from discipline only by pressure from the employers. The union President views waiver of discipline as a mistake. Relatively certain knowledge that plaintiffs will meet the imposition of union discipline which Huntley missed narrowly, if they violate their written agreement to abide by union discipline is of itself a chill equal to the chilling effects found by the Supreme Court in cases such as Near v. Minnesota, 283 U.S. 697, 51 S. Ct. 625, 75 L.Ed. 1357 (1931); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed. 2d 584 (1963); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); Organization For a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); and New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

Evans testified as to the chilling effect upon him. Besides the chilling effect to be drawn from a literal reading of the disciplinary provisions of Aftra's constitution, to which he had been required to sign his name signifying assent in order to gain employment, Evans testified on oral deposition that " . . . if Aftra goes on strike, I might cross the picket line. I think there is simply a generic implication that I conduct my broadcasting activity so as to be at the sufferance of Aftra."

(p. 22). He testified further that "I have definitely felt inhibited by the requirement of Aftra membership . . . It was a question of membership to begin with, whether I should make an issue of this and resist joining Aftra at the time that it was required that I join, and I decided that I shouldn't because it might well abort my broadcasting career. The second obvious case is that I have felt inhibited by virtue of my Aftra membership from delving into the question of compulsory membership in Aftra, which had been a topic of controversy, and I have not done a Spectrum broadcast on that subject. I didn't want to jeopardize my membership and therefore jeopardize my broadcasting career."

Again: "I would say 'chilling effect' would be an appropriate description of my feeling with regard particularly to this issue. I am aware with (sic) Mr. Buckley's suit. I sympathize with the suit. At the time it came up I knew him, yet I didn't broadcast about it because I felt its chilling effect."

The circumstances surrounding Evans's situation are sufficient to warrant a conclusion that Evans was in fact chilled and inhibited.

In the case of Buckley, the actual restraint on his freedom of speech upon which he relies in this litigation is that he was required to join the union and to promise to abide by the constitution and regulations which he reasonably interprets as "that I am not allowed to say certain things that I would be disposed to say because it might prejudice the welfare of the union." (Minutes, p. 63). He further testified "I have felt a chilling effect on my right to express myself in the light of the fact that the union exercises over me certain disciplinary powers which could result in fining me or taking me off the air, if I acted in such a way as to prejudice that union. That is my understanding of my obligations as a member of Aftra."

The fact that Buckley asserts that he did not "cave in" under the chilling effect, and that he is "defying" Aftra

places him in no different position than that of Evans.

On the entire record before me, and in view of the prior experiences of Chester Huntley, I find that the chilling effect and the impairment of the freedom of expression of thought by Buckley and Evans as commentators and analysts of public affairs is real and substantial, rather than merely speculative, and is sufficient to present a justiciable controversy. In order to sustain what they assert to be their rights, it would not appear necessary for them to stop paying their dues to Aftra and be fired from their jobs. Instead, they may continue in good standing while seeking declaratory and equitable relief.

## First Amendment Rights

 Prior restraints on freedom of speech by federal, state or local government, or by those acting pursuant to Congressional authority, as is defendant, cannot be sustained in the absence of a competing and compelling necessity which, if not satisfied, will "surely result in direct, immediate, and irreparable damage to our Nation or its people". New York Times Co. v. United States, 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971). As further cases come before the Supreme Court, the trend progresses toward the simplistic suggestion made by the late Justice Hugo L. Black during a famous interview, reported in The New York Times June 11, 1962. After noting the words of the First Amendment, Justice Black said:

"I understand that it is rather old-fashioned and shows a slight naivete to say that 'no law' means no law, but what it says is, 'Congress shall make no law.' * * * [W]hen I get down to the really basic reason why I believe that 'no law' means no law, . . . I took an obligation to support and defend the Constitution as I understand it. And being a rather backward country fellow, I understand it to mean what the words say. * * * It says 'no law,' and that is what I believe it means."

See also, Mr. Justice Black in New York Times Co. v. United States, *supra*; Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952); Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); and New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Prior restraints are presumed invalid, and the presumption is said to be heavy. Organization For A Better Austin v. Keefe, *supra*.

 A prior restraint purely ministerial in nature was rejected in Lamont v. Postmaster General, *supra*, because considered "a limitation on the unfettered exercise of . . . First Amendment rights". Cases such as Near v. Minnesota, *supra*, which permit Congress to place restrictions on First Amendment expression must be founded upon a compelling interest which cannot be achieved in any other reasonable manner in lieu of the proposed restrictions. Cases limiting the police powers of states to chill First Amendment rights are equally applicable to Congressional action. National Association for the Advancement of Colored People v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Some of the most recent expressions of the Supreme Court are found in Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); and Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

The principles stated apply, among other things, to discussion of public affairs, the highest level of First Amendment rights. Restrictions placed on mere commercial activity, *e. g.* rules against commercial signboards or anti-littering cases, Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262

(1942), are contrasted with Thornhill v. Alabama, *supra,* in which the Court analyzed freedom of speech and of the press as embracing the "liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." This plaintiffs do not presently enjoy. See also New York Times Co. v. Sullivan, *supra* (". . . profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open"); Garrison v. Louisiana, 379 U.S. 64, at p. 74, 85 S.Ct. 209, at p. 216, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self expression; it is the essence of self-government"); see also Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); United States of America v. The National Committee For Impeachment, 469 F.2d 1135 (2d Cir. 1972), decided October 30, 1972.

Defendant cites cases such as Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir.), cert. den. 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116 (1971, Chief Justice Burger and Justice Douglas dissenting), which refused to sustain as a free exercise of religion under the First Amendment the claim of persons who were discharged because their religious principles forbade them to pay union dues. What determination the Supreme Court will adopt on this issue in construing § 8(a)(3) as to those who claim religious immunity, when such a case reaches that Court, remains to be seen. In light of the subsequent holding in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), it may sustain a free exercise claim. In *Wisconsin,* the Court stated at p. 215, 92 S. Ct. at p. 1533:

"The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. We can accept it as settled, therefore, that however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests. *E. g.,* Sherbert v. Verner, 374 U.S. 398 [, 83 S.Ct. 1790, 10 L.Ed.2d 965] (1963); McGowan v. Maryland, 366 U.S. 420, 459 [, 81 S.Ct. 1101, 6 L.Ed. 2d 393] (1961) (separate opinion of Frankfurter, J.); Prince v. Massachusetts, 321 U.S. 158, 165 [, 64 S.Ct. 438, 441, 88 L.Ed. 645] (1944)."

While free exercise of religion is of great concern to this Court, it hardly occupies the high standing at the bar of a claim for freedom of speech with respect to public affairs.

The foregoing discussion of freedom of speech must be taken to relate to those, and only those, who serve as analysts, commentators and those whose speech on radio and television contains in substantial portion expressions of their own philosophy, conclusions, opinions, bias and evaluation, applied in accordance with their own personal opinions and tenets, and presented as such. Defendant states, in part correctly, that:

"Freedom of press and speech means expression not limited to the printed or spoken word. Ideas, impressions, analysis and commentary on public persons and affairs also are expressed in song, dance and pantomime, as comedy, satire, soap operas, plays, dramatizations, documentaries, even in commercials. . . . one picture often expresses more than a thousand words, whether on a newspaper page or on a television screen. Even a juggler's mute performance has been understood as commentary. Choreographers comment on public persons and affairs via dance steps which dancers perform without a word spoken. Instrumental music alone can be expressive. Silence, too, is understood as a form of expression." (Affidavit of Edward Schlesinger, Esq., p. 3, sworn to May 3, 1972.)

This argument misses an obvious distinction. To the juggler and comic we may add, by way of example, the impersonator who takes off on the manners or diction of a public figure, in manner to disparage, and the newscaster reading from a prepared script, who expresses incredulity by inflection, or merely by moue. But those who do so, unlike plaintiffs, are primarily artists, actors and performers. They are not discharging a duty imposed by statute upon the broadcasters of furnishing a fair balance of opinion so that the public may hear that which it needs in order to act intelligently in the area of self-government.

█ As to those persons who are actors, artists and professional talent, the businesses in which they are engaged, or the services which they perform, are not intimately associated with the exercise of First Amendment rights. As to them, the undoubted need which Congress has found to exist for trade union protection may be sufficient to justify such prior restraint as may result. In essence, the juggler, the comic and the soap opera star are hired as actors; they are not hired for the purpose of presenting an opinion to be passed off as their own sincere views.

█ Nowhere in the legislative history do we find any Congressional intent to use the statute as a means of stifling free expression of speech or of the press. The purpose for which the statute was enacted was to protect working men in the crafts and unskilled labor, to enable them to bargain collectively for such things as job security, adequate wages and fair working conditions. Congress concluded that under certain circumstances union shop conditions were necessary to achieve this end, although Congress permitted a state, if so advised, to provide otherwise (29 U.S.C. § 158; 29 U.S.C. § 164).

As to artists, actors and professional talent other than commentators, the union has a reasonable fear of the erosion of its role in the event that an artist or entertainer were permitted to "opt out" of the union on a claim of First Amendment rights.

The fact that in the past employers may have attempted to evade prior union contracts by passing off as commentators and analysts those who were not, does not justify the First Amendment restraint here found.

█ It is not necessary to declare Section 8(a)(3) unconstitutional on its face in order to effectuate plaintiffs' rights; rather we construe the section as not intending to provide any means whereby a union could place a direct threat of prior restraint upon a person so situated as are plaintiffs, as a combined result of (a) compulsory membership; (b) the need to subscribe to terms and conditions of union discipline; (c) the need to refrain from speaking through a broadcast outlet judged unfair, or not organized; (d) the need to refrain from crossing a picket line; and (e) the need to heed any other union directions which would operate directly or indirectly as a prior restraint on freedom of speech.

Insofar as Evans is concerned, the record is clear that he has confined his broadcasting efforts solely to the area of commentator and analyst on news and public affairs, expressing his own opinion, philosophy and conservative bias. Buckley has done all that too, but he has suffered himself to be called a "TV Star", and possibly may have appeared on some program in the past, or may in the future choose to participate in some program, where the format may be such as to cast him in the role of a mere entertainer, without any substantial opportunity to express his personal opinions, analysis and comments as such. If so, he must join Aftra. We do not consider service as a moderator to be such performance, unless the moderator is restricted by the program format from expressing any personal philosophy or opinion. If a moderator is cast in the role of an impartial chairman at a meeting at which others than the chair have the sole right to exercise their First

848

Amendment rights, then such a moderator could be required in our view to submit to Aftra's Code. The same applies to commentators on matters such as professional sports, meteorology, farm prices, fashions, market reports, etc., all of whom were traditionally covered by Aftra Codes prior to 1967.

## The Free Rider

In its brief, defendant argued for the first time (p. 51) that plaintiffs were seeking to be "free riders" in attaining the benefits of Aftra's efforts as their collective bargaining agent, and that if they were not required to join or pay dues, and presumably, not required to subject themselves to union discipline, they, at the very least, had to pay to the union an amount equal to the dues.

Defendant urged that paying such a toll to Aftra "is certainly no more violative of free speech than are the tolls imposed by federal, state and city governments to cross a bridge over the River Platte, for admission to the bar, to do business as an employment agency or innumerable other professions, occupations or enterprises." (Brief, p. 51, et seq.)

Plaintiffs, in rejoinder, suggest correctly that the mere making of this argument does not constitute "a frank recognition of error and a permanent disclaimer of claims so long insisted upon." (Plaintiffs' reply brief, p. 20.)

The pleadings and the prior conduct of the parties clearly indicate that what is at issue, and what has been litigated, is the question of the requirement of membership and subjection to union discipline of a commentator or news analyst. More is involved in this controversy than mere payment of a modest dues bill, and the prior conduct of the union and the prior conduct of the employers required by the union agreement make it appropriate that these issues be resolved by declaratory judgment.

In this declaratory judgment action, in view of the prior conduct of the defendant, plaintiffs are entitled to relief from uncertainty and insecurity with respect to rights, status and other legal relations. They are entitled to have their legal relations clarified and to be freed from such uncertainty, insecurity and controversy.

The "free rider" argument, raised tentatively, and for the first time in the brief, does not moot the lawsuits. Defendant's dues appear reasonable. Cases holding that the worker's only obligation is to pay an amount equal to dues with no necessity of joining or submitting to union discipline are based on the theory that ". . . those who enjoy the fruits and the benefits of the unions should make a *fair* contribution to the support of unions." Railway Employees Department v. Hanson, 351 U.S. 225, 231, 76 S.Ct. 714, 718, 100 L.Ed. 1112 (1956, quoting from Congressional debates); Machinists v. Street, 367 U.S. 740, 750–764, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L. Ed.2d 670 (1963).

There is no evidence raising the factual issue contemplated by the "free rider" cases, that is whether these plaintiffs are in fact "free riders," or whether they do in fact enjoy any Aftra benefits. Apparently, these plaintiffs, by reason of union membership, are enrolled in defendant's pension plan. That is all. They each bargained for their own compensation, which is in excess of the union "scale" or minimum, and do not appear to have benefited in any other manner.

If there were any substantial "free rider" benefits, possibly a news commentator could be required to pay an amount not greater than union dues without seriously impinging his First Amendment rights, or chilling his freedom of expression.

## Conclusion

Defendant's motion for summary judgment is denied. Plaintiffs' motion is granted, and a single judgment shall be settled on fifteen (15) days notice, or on waiver of notice, declaring the rights of plaintiffs as hereinbefore provided.

There is no need at this time to grant the permanent injunctive relief sought by the order to show cause, because there is no reason to believe defendant will not act in accordance with law, and honor plaintiffs' rights as declared by this Court. Such injunctive relief is denied, without prejudice to renew, and the judgment may reserve jurisdiction to grant injunctive relief on notice, should it be necessary.

Insofar as concerns the denial of injunctive relief, the foregoing constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52(a), F.R.Civ.P.

In the interests of justice, the status quo, and the relationships between the parties to this litigation, and between plaintiffs and broadcasters having contracts with Aftra should not be disrupted pending appellate review of the foregoing at the instance of any party. Accordingly, the judgment shall provide that it is in all respects stayed pending appeal. See New York CPLR § 5519(c) and § 2201, made applicable by Rule 62(d) and (f), F.R.Civ.P. No bond shall be required.